# TAB 1

# FREEDOM COURT REPORTING

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  ALICE J. BROWN,        )
6  Plaintiff,    )
7  vs.              ) CASE NUMBER:
8  ITPE HEALTH AND WELFARE  ) 2:05-CV-1002-ID
9  FUND,            )
10  Defendant.    )
11
12  DEPOSITION OF ALICE J. BROWN
13  In accordance with Rule 5(d) of
14  The Alabama Rules of Civil Procedure, as
15  Amended, effective May 15, 1988, I, Cindy
16  Weldon, am hereby delivering to Taylor P.
17  Brooks, the original transcript of the oral
18  testimony taken on the 13th day of June,
19  2006, along with exhibits.
20  Please be advised that this is the
21  same and not retained by the Court Reporter,
22  nor filed with the Court.
23

**Page 3**

1  AGREED that the signature to and the reading
2  of the deposition by the witness is waived,
3  the deposition to have the same force and
4  effect as if full compliance had been had
5  with all laws and rules of Court relating to
6  the taking of depositions.
7  IT IS FURTHER STIPULATED AND
8  AGREED that it shall not be necessary for
9  any objections to be made by counsel to any
10  questions, except as to form or leading
11  questions, and that counsel for the parties
12  may make objections and assign grounds at
13  the time of trial, or at the time said
14  deposition is offered in evidence, or prior
15  thereto.
16  IT IS FURTHER STIPULATED AND
17  AGREED that notice of filing of the
18  deposition by the Commissioner is waived.
19
20
21
22
23

**Page 2**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  ALICE J. BROWN,        )
6  Plaintiff,      )
7  vs.         ) CASE NUMBER:
8  ) 2:05-CV-1002-ID
9  ITPE HEALTH AND WELFARE  )
10  FUND,            )
11  Defendant.    )
12
13  STIPULATION
14  IT IS STIPULATED AND AGREED, by
15  and between the parties through their
16  respective counsel, that the deposition of
17  ALICE J. BROWN, may be taken before Cindy
18  Weldon, Certified Shorthand Reporter,
19  Commissioner and Notary Public, at the
20  offices of Copeland, Franco, 444 South Perry
21  Street, Montgomery, Alabama, on June the
22  13th, 2006 at 9:30 a.m.
23  IT IS FURTHER STIPULATED AND

**Page 4**

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4  MR. BRIAN STRENGTH
5  306 NORTH MAIN STREET
6  TUSKEGEE, ALABAMA  36083
7
8  FOR THE DEFENDANT:
9  MR. TAYLOR P. BROOKS
10  200 WEST SIDE SQUARE
11  SUITE 5000
12  HUNTSVILLE, ALABAMA  35801
13
14
15
16
17
18
19
20
21
22
23

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 5

1           I N D E X
2
3    EXAMINATION BY:              PAGE
4    MR. BROOKS              6, 114
5    MR. STRENGTH              110
6
7
8
9           E X H I B I T S
10                PAGE
11   DEFENDANT'S EXHIBIT NO. 1        34
12   DEFENDANT'S EXHIBIT NO. 2        46
13   DEFENDANT'S EXHIBIT NO. 3        54
14   DEFENDANT'S EXHIBIT NO. 4        56
15   DEFENDANT'S EXHIBIT NO. 5        60
16   DEFENDANT'S EXHIBIT NO. 6        63
17   DEFENDANT'S EXHIBIT NO. 7        64
18   DEFENDANT'S EXHIBIT NO. 8        93
19
20
21
22
23

Page 6

1           ALICE J. BROWN,
2    after first being duly sworn, testified
3           as follows:
4    EXAMINATION BY MR. BROOKS:
5           THE COURT REPORTER: Usual
6    stipulations?
7           MR. BROOKS: Yes.
8           MR. STRENGTH: Yes.
9       Q. Ms. Brown, my name is Taylor
10   Brooks. I am an attorney for -- the
11   attorney in this case for the ITPE Health
12   and Welfare Fund. I'm here to ask you
13   questions today about the lawsuit.
14          If you don't understand any
15   question that I ask, please feel free to ask
16   me to rephrase it or ask it again.
17   Sometimes questions only make sense to
18   lawyers and not to normal people.
19          So please feel free, if you don't
20   understand any part of my question, to
21   please feel free to ask me to ask it again.
22   We're under no time constraints.
23      A. Okay.

Page 7

1       Q. So I can ask it until we all
2    understand. If you don't ask me to rephrase
3    it or ask it again, I'm going to assume that
4    you understand the question. Is that fair?
5       A. Yes, that's fair.
6       Q. Okay. Another thing -- and you're
7    already doing a good job -- but we have a
8    court reporter taking down what we're saying
9    here to make a transcript.
10          So if I ask you a question, you'll
11   need to say yes or no and not nod your head
12   or say uh-huh so that we can have a clear
13   record of what your answer is.
14      A. Okay.
15      Q. And like I said, you're doing a
16   good job of that already. But I just wanted
17   to let you know. And also we can't talk
18   over each other.
19          So if I'm asking a question, I'd
20   appreciate your letting me finish. If you
21   are not finished with your answer and I jump
22   in with the next question, you can tell me
23   or your attorney may tell me that you're not

Page 8

1    finished.
2       A. Okay.
3       Q. So we can make sure and have the
4    full questions and full answers on the
5    record. Also, are you -- Have you taken any
6    type of medication that has impaired you in
7    any way to testify today?
8       A. No.
9       Q. Fair enough. All right. Could
10   you state your name, please.
11      A. Alice Jean Brown.
12      Q. And, Ms. Brown, you are the
13   plaintiff in a lawsuit against ITPE Health
14   and Welfare Fund?
15      A. Yes.
16      Q. And that's you who's testifying
17   here today?
18      A. Yes.
19      Q. Okay. Also, one other thing I
20   forgot in my opening remarks. If you need
21   to take a break, if you need to use the
22   restroom or for any other reason to take a
23   break, please feel free to let me know.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  We can take a break. I'd just
2  appreciate being able -- to ask you to
3  answer whatever question is on the table
4  before you take a break or a series of
5  thoughts.
6  But after that, we're not -- it's
7  not an endurance contest. So if you need to
8  take a break, just let me know and we can
9  accommodate you.
10  A. Okay.
11  Q. Ms. Brown, what is your date of
12  birth?
13  A. December the 31st, 1963.
14  Q. Okay. Ms. Brown, what is your
15  social security number?
16  A. 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.
17  Q. Ms. Brown, what is your current
18  address?
19  A. 3034 Apartment D, Kelly Circle.
20  Q. I'm sorry, what circle?
21  A. Kelly.
22  Q. Kelly?
23  A. K-E-L-L-Y.

Page 11

1  approximately 1994?
2  A. Yes.
3  Q. That's as far back as I need to
4  go. Are you currently employed?
5  A. Yes.
6  Q. Where are you employed?
7  A. Petrey's Wholesale.
8  Q. I'm sorry?
9  A. Petrey's Wholesale.
10  Q. Could you spell that?
11  A. P-E-T-R-E-Y.
12  Q. R-E-Y?
13  A. Yes.
14  Q. Okay. Petrey's Wholesale?
15  A. Yes.
16  Q. And how long have you worked for
17  Petrey's Wholesale?
18  A. June the 26th will be a year.
19  Q. Okay. So you started June the
20  26th, 2005?
21  A. Yes.
22  Q. Where is Petrey's Wholesale
23  located?

Page 10

1  Q. Okay. Is that in Montgomery?
2  A. Yes.
3  Q. Okay. What is the zip code?
4  A. 36116.
5  Q. How long have you lived at that
6  address?
7  A. I just moved May the 5th.
8  Q. You've lived there since May the
9  5th, 2006?
10  A. Yes.
11  Q. Where did you live before May 5th,
12  2006?
13  A. 1019 Apartment N, Day Street
14  Road.
15  Q. Is that in Montgomery?
16  A. Yes.
17  Q. Is that the same zip or a
18  different zip code?
19  A. Different. 36108.
20  Q. How long did you live at that
21  address?
22  A. Approximately twelve years.
23  Q. So that would take us back to

Page 12

1  A. It's off of Air Base Boulevard.
2  Q. Off of what?
3  A. Air Base Boulevard.
4  Q. Is that in Montgomery?
5  A. Yes.
6  Q. I apologize. I'm not from
7  Montgomery. I'm not familiar with some of
8  the streets. And what do you do at -- What
9  are your job duties or a job title at
10  Petrey's Wholesale?
11  A. I work in the cigarette
12  department.
13  Q. And what do you do?
14  A. I pick orders of cigarettes to be
15  shipped to different stores here.
16  Q. Do you have medical insurance
17  through your work at Petrey's Wholesale?
18  A. Yes.
19  Q. Is that like Blue Cross Blue
20  Shield?
21  A. Yes.
22  Q. Before you worked for Petrey's
23  Wholesale, where were you employed?

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1    A.  Out on Maxwell Air Force Base at
2  Central Alabama Food Service.
3    Q.  What were your dates of employment
4  at -- approximately to the best of your
5  recollection?
6    A.  I can't really quite recall the
7  dates of my -- I think I -- I'm thinking
8  that I started like in -- I had been there
9  right at five years.  So I'm thinking I
10  started in 2001.
11    Q.  Is that a best guess?
12    A.  Yes, best guess.
13    Q.  Okay.  When did your employment
14  end with Central Alabama Food Service?
15    A.  In July of '04.
16    Q.  Why did your employment end at
17  Central Alabama Food Service?
18    A.  I was terminated.
19    Q.  You were terminated?
20    A.  Yes.
21    Q.  Do you remember why you were
22  terminated?
23    A.  Not exactly.  Not exactly.  I

Page 15

1  Central Alabama Food Service?
2    A.  I was a K. P.
3    Q.  What does that stand for?
4    A.  It's just K. P.  We just -- They
5  have us do everything from busing to
6  cleaning tables and whatever they needed us
7  to do around there.
8    Q.  Okay.  I mean, do you remember
9  having any title there?
10    A.  No.  They just called us K. P.
11    Q.  Called you K. P.'s?
12    A.  Yes.
13    Q.  Where were you employed before
14  Central Alabama Food Service?
15    A.  I used to work at K.B. Toys.
16    Q.  K.B?
17    A.  K.B. Toys.
18    Q.  K.B. Toys?
19    A.  Yes.
20    Q.  Do you remember -- Do you have an
21  approximation of when you worked there?
22    A.  I can't quite remember the date.
23  I'm thinking it was in '04, too, because I

Page 14

1  really don't.  It was something that I
2  didn't understand myself.
3    Q.  Do you remember what you were
4  told?
5    A.  They didn't really tell me
6  anything.  They just told me that I was
7  terminated and that was that.
8    Q.  Okay.  You were terminated by
9  Central Alabama Food Service?
10    A.  Yes.
11    Q.  So from July 2004 to June 2005,
12  were you unemployed?
13    A.  Yes.
14    Q.  Were you receiving -- During that
15  time that you were unemployed, were you
16  receiving Medicaid or --
17    A.  No.  Just unemployment.
18    Q.  Unemployment.  Anything else?
19    A.  No.
20    Q.  So you didn't have any health
21  insurance during that time?
22    A.  No.
23    Q.  What were your job duties at

Page 16

1  only worked there for a couple of months.
2    Q.  In '04?
3    A.  '04.  I mean 2004.
4    Q.  So was that after --
5    A.  No.  Let me think about the
6  question.
7    Q.  Okay.
8    A.  Let me think for a minute.
9    Q.  Take all the time you need.
10    A.  Okay.  I think it was '02.  2002,
11  I think.  I just can't quite remember the
12  dates.
13    Q.  Okay.  Did you go straight from K.
14  B. Toys to being employed by Central Alabama
15  Food?  Was there any time in between your
16  employments to the best of your
17  recollection?
18    A.  No.  I went straight from there to
19  Central Alabama Food Service.
20    Q.  What was your reason for leaving
21  K. B. Toys?
22    A.  They had a -- They kind of slowed
23  down in production and stuff and they didn't

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1 quite need the people that they had.
2     Q.   Did you quit or were you
3 terminated?
4     A.   No, I didn't quit.  It's just that
5 they -- the work had slowed down and they
6 didn't need us, need all the people no more.
7     Q.   So were you getting less hours?
8     A.   No.  I was given my same amount of
9 hours.  It's just that business had slowed
10 down.
11     Q.   Okay.
12     A.   And they didn't need all the
13 people that they had employed.
14     Q.   Okay.  So were you laid off,
15 terminated or did you quit that job to take
16 the new job?
17     A.   No, I did not quit.
18     Q.   Okay.  You didn't quit?
19     A.   No.  It's like they laid off some
20 of the employees.
21     Q.   Oh, okay.
22     A.   Yes.
23     Q.   They laid off employees because

Page 18

1 the work was slowing down?
2     A.   Yes.
3     Q.   Okay.  And after you were laid
4 off, you looked for new employment and found
5 new employment at Central Alabama Food?
6     A.   Yes.
7     Q.   When you worked at -- How long do
8 you remember was the time between when you
9 ended your employment at K.B. Toys and when
10 you started at Central Alabama Food?
11     A.   It was approximately maybe six
12 months afterwards.
13     Q.   Okay.  So it was six months where
14 you were unemployed?
15     A.   Yes.
16     Q.   When you worked at K.B. Toys, did
17 you have health insurance through your
18 business?
19     A.   No.
20     Q.   You didn't?
21     A.   No.
22     Q.   Okay.  So did you have any health
23 insurance during that time?

Page 19

1     A.   No.
2     Q.   Okay.  How long did you work at
3 K.B. Toys before you were laid off?
4     A.   About four months.
5     Q.   Four months.  Do you remember
6 where you worked before K.B. Toys?
7     A.   As a matter of fact, yes.  It was
8 Cantu Services, which is like a contract job
9 through with Central Alabama Food Service.
10 It was first -- It was Cantu Services.  It's
11 the same place.
12     Q.   Let me see.  Is Cantu Services --
13 and tell me if you think this is right.  I'm
14 not trying to put words in your mouth.  I'm
15 trying to make sense of what you're telling
16 me.
17         Are you saying that Cantu Services
18 had the same contract at Maxwell Air Force
19 Base that Central Alabama Food has?
20     A.   Yes.
21     Q.   It was a different business?
22     A.   No.  It's the same building.  But
23 it's like it had different people that

Page 20

1 contract during the time.  When I was
2 working there before, it was Cantu Service.
3         And then when I left and went to
4 K.B. Toys and came back, Central Alabama
5 Food Service got the contract.
6     Q.   Okay.  Did Central Alabama Food
7 Services get the same contract that Cantu
8 Services had previously had?
9     A.   Yes.
10     Q.   Okay.  So you were doing the same
11 job with Cantu Services that you were with
12 Central Alabama Food?
13     A.   Yes.
14     Q.   Okay.  And how long had you worked
15 -- And that would be K.B. and --
16     A.   Yes.
17     Q.   How long did you work for Cantu
18 Services?
19     A.   Approximately two and a half
20 years.
21     Q.   Two and a half years?
22     A.   If I'm not mistaken.
23     Q.   Then you had the same job title?

5  (Pages 17 to 20)

## FREEDOM COURT REPORTING

Page 21

1    A.   Yes.
2    Q.   Job duties.  You've already told
3  me that.  Why did your employment end at
4  Cantu Services?
5    A.   That's when I had left to go to
6  work at K.B. Toys.
7    Q.   Okay.  Did you quit your job with
8  Cantu Services or were you terminated or
9  laid off?
10   A.   No.  You could say I quit.
11   Q.   You quit Cantu Services?
12   A.   Yes.
13   Q.   To work for K.B. Toys?
14   A.   Yes.
15   Q.   What was your reason for quitting
16  Cantu Services to work for K.B. Toys?
17   A.   It was for better benefits.  More
18  money and better benefits.
19   Q.   What benefits were there at K.B.
20  Toys that you didn't have at Cantu?
21   A.   If I had of -- If they hadn't of
22  laid us off after those four months, I would
23  have been able to get the insurance and plus

Page 22

1  I was making more money.
2    Q.   Let me make sure I understand.
3  You would have been eligible -- Had you
4  stayed at K.B. Toys a certain amount of
5  time, you would have been eligible to have
6  -- to receive health insurance benefits
7  through the company?
8    A.   Yes.
9    Q.   Okay.  But you did not reach that
10  time that you would have been eligible
11  before you were laid off; is that correct?
12   A.   Yes.
13   Q.   At Cantu Services, did you have
14  any health insurance?
15   A.   Yes.
16   Q.   Okay.  And what health insurance
17  was that?
18   A.   It's the same.  ITP.
19   Q.   ITP.  Okay.  And where did you
20  work before Cantu Services?
21   A.   I also worked at the post office.
22   Q.   The post office?
23   A.   Yes.

Page 23

1    Q.   Okay.  Were you employed in the
2  United States government?
3    A.   Yes.
4    Q.   That was your job directly before
5  Cantu Services?  Was there any time that you
6  were unemployed between the post office --
7  working for the post office and working for
8  Cantu Services?
9    A.   Cantu Services, I worked there --
10  I mean Central Alabama Food -- yes, Cantu
11  Services, I worked there first.  Then I
12  started working for K.B. Toys.
13        Then I went back to Central
14  Alabama Food Service, but I also was working
15  at the post office at the same time.  So I
16  was working two jobs.
17   Q.   Oh, okay.  So you were working for
18  the post office while you were working for
19  Central Alabama?
20   A.   Yes.
21   Q.   Okay.  So what were your
22  approximate dates of employment with the
23  post office?

Page 24

1    A.   To my recollection, I think it was
2  2002 until 2003.
3    Q.   Did you receive any type of health
4  insurance or health benefits while working
5  at the post office?
6    A.   No.
7    Q.   Why did your employment with the
8  post office cease?
9    A.   It was like -- It was seasonal.
10  We worked so many months.
11   Q.   What were your job duties with the
12  post -- for working for the post office?
13   A.   I was a casual clerk and I used to
14  just sort mail.
15   Q.   You were a casual clerk?
16   A.   Yes.
17   Q.   That was your job description and
18  your job duty, was to sort mail?
19   A.   Sort mail, yes.
20   Q.   And you were a seasonal employee.
21  So you tell me.  You worked some times of
22  the year and did not work other times of the
23  year?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.  Yes.
2    Q.  What times of the year did you
3  work?
4    A.  The first time I worked from like
5  September until June.
6    Q.  Okay.
7    A.  And after that, the next time I
8  started back like in --
9    Q.  Was that September -- I'm sorry.
10  I interrupted you.
11    A.  No.  Go ahead.
12    Q.  When you say September to June, do
13  you mean -- I know it's hard to remember
14  dates with certainty.  But do you remember
15  that being September of 2002 to June of 2003
16  or --
17    A.  It was -- I think it was September
18  of 2002, I think.  I'm just bad with the
19  dates right now.
20    Q.  I understand.
21    A.  Until June of 2003.
22    Q.  Okay.
23    A.  Then I went back in November of

Page 26

1  2003 I think and worked until June of 2004,
2  I guess.  Something like that.
3    Q.  Did the post office give you the
4  option of having health benefits?
5    A.  No.
6    Q.  At some point, you quit working as
7  a seasonal employee for the post office?
8    A.  Yes.
9    Q.  And do you know why that was?
10    A.  Well, after the contract was up, I
11  never did go back and reapply for the job no
12  more.  I just stayed at Central Alabama Food
13  Service.
14    Q.  When you say the contract was up,
15  what contract are you talking about?
16    A.  We had a -- It was a contract.
17  Because we were seasonal, we worked so many
18  months out of the year.
19    Q.  Okay.
20    A.  And once those months are up, you
21  had the option of going back and reapplying
22  again.
23    Q.  Oh, you had to reapply every time

Page 27

1  that --
2    A.  Yes.
3    Q.  You say you didn't go back and
4  reapply?
5    A.  No.
6    Q.  Now, that was during your -- I
7  guess let's go back.  You worked for Cantu
8  Services for two and a half years before you
9  even went to K.B. Toys?
10    A.  Yes.
11    Q.  Where were you employed before you
12  worked for Cantu Service?
13    A.  It was -- I used to work at the
14  airport.
15    Q.  Here?
16    A.  Danley Field Airport here in
17  Montgomery.
18    Q.  Okay.  Who was your employer?
19    A.  His name was Mr. Long.
20    Q.  Mr. Long?
21    A.  Yes.
22    Q.  What did Mr. Long do?
23    A.  Well, Mr. Long was my supervisor.

Page 28

1  But I worked for Globe Security.
2    Q.  Globe Security?
3    A.  Yes.
4    Q.  What did you do for Globe
5  Security?
6    A.  Operate the x-ray machine.
7    Q.  Is that when people are going into
8  the airport and --
9    A.  Yes.
10    Q.  -- putting their belongings --
11    A.  Check point, yes.
12    Q.  And your job was to operate the
13  machine?
14    A.  Operate the machine and check the
15  people when they go through the metal
16  detector.
17    Q.  Okay.  How long did you work for
18  Globe Security?
19    A.  Maybe eight months.
20    Q.  Eight months?
21    A.  Yes.
22    Q.  And why did your employment at
23  Globe Security end?

7 (Pages 25 to 28)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    A.  I applied for a job with Central
2  -- with Cantu Services and I got the job
3  with them.
4        MR. BROOKS:  Can we go off the
5  record.
6        (Whereupon, a short recess was
7  taken.)
8    Q.  Let me try to remember where we
9  were before we broke.  I think I asked you
10  why your employment with Globe Security
11  ended.
12    A.  And I applied for a job with Cantu
13  Services.
14    Q.  Okay.  How did you become aware of
15  Cantu Services?
16    A.  One of the employees that was
17  working there, she was in the military.
18    Q.  Okay.
19    A.  And she told me about the job.
20  And I went out there and applied for it.
21    Q.  Why did you want to work for Cantu
22  Services?  What were -- Why did you want to
23  work for Cantu Services and not Globe

Page 31

1    Q.  You didn't?
2    A.  No.
3    Q.  When did you learn of the ITPE
4  Health and Welfare Fund?
5    A.  Let me -- With this question right
6  here, they did mention about insurance once
7  you've been there for a while.  And that's
8  when I learned about the insurance, ITP.
9    Q.  Let's go back.  Who told you this?
10    A.  When they had interviewed us for
11  the job and everything.  And I'm thinking
12  that it was Ms. Jefferson.
13    Q.  Was Ms. Jefferson an employee of
14  Cantu Services?
15    A.  Yes.
16    Q.  What did Ms. Jefferson tell you?
17    A.  At the time when they hired me and
18  stuff and then they -- they told us about
19  the insurance and stuff, then what the job
20  offers as far as insurance and stuff.
21    Q.  Do you remember specifically what
22  she said?
23    A.  No.

Page 30

1  Security?
2    A.  Cantu Services paid more money.
3    Q.  Okay.
4    A.  Plus they had benefits.
5    Q.  What type of benefits were those?
6    A.  They had insurance and stuff and I
7  didn't have them at Globe Security.
8    Q.  You didn't have health insurance
9  with Globe Security?
10    A.  No.
11    Q.  What other -- I mean, what
12  benefits specifically?  You said health.
13  Were there any other benefits?
14    A.  Health and medical.  I mean,
15  vision, dental.  They offered all of that.
16    Q.  Okay.  I may have asked this
17  before and I apologize.  How long did you
18  work for Globe Security?
19    A.  Maybe eight months.
20    Q.  Okay.  When your employment began
21  at Cantu Services, did you know of the ITPE
22  Health and Welfare Fund?
23    A.  No.

Page 32

1    Q.  Do you remember her specifically
2  mentioning the IPTE Health and Welfare Fund?
3    A.  No.
4    Q.  You just remember her saying --
5    A.  As a matter of fact, we had a
6  meeting.  All the employees was there.  And
7  that's when we did the paperwork and stuff
8  for the insurance.
9    Q.  Okay.  This was after you were
10  employed?
11    A.  Yes.
12    Q.  Okay.  But your meeting with Ms.
13  Jefferson you were talking about, was that
14  when you were interviewing or was that after
15  you were employed?
16    A.  It was after I was employed.
17    Q.  Okay.  Before you were employed,
18  did you know anything about ITPE Health and
19  Welfare Fund?
20    A.  No.
21    Q.  After you were employed, you said
22  that you had a meeting to fill out
23  paperwork.  How long after you were employed

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  do you remember this being?
2  A.  I don't.  I don't recall.
3  Q.  Was it -- Do you remember if it
4  was days or weeks or months?
5  A.  It probably was a couple of months
6  after we was employed or after I was
7  employed.
8  Q.  Did you not have benefits for the
9  first few months of your employment?
10  A.  No.
11  Q.  Were you a temporary employee?
12  A.  No.
13  Q.  You weren't?
14  A.  No.
15  Q.  Why was your understanding that
16  you did not receive benefits right away when
17  you became employed by Cantu Services?
18  A.  You have to work so many months in
19  order to be enrolled in the program.
20  Q.  Okay.
21  A.  You just don't just get it right
22  off the bat when you first start.
23  Q.  So when you had the meeting where

Page 34

1  you filled out paperwork, did you -- what
2  type of paperwork was that; do you remember?
3  A.  Beg your pardon?
4  Q.  What type of paperwork did you
5  fill out?  You said you had a meeting with
6  other employees you said where you filled
7  out paperwork for your health benefits; is
8  that correct?
9  A.  Yes.
10  Q.  Okay.  And what type of paperwork
11  did you fill out to the best of your
12  recollection?
13  A.  I just know it was just forms and
14  stuff that we had to fill out, you know,
15  through the insurance company in order for
16  to get the insurance.
17  Q.  Did you get a booklet from the
18  insurance company?
19  A.  Yes.
20  Q.  Okay.
21  (Whereupon, Defendant's Exhibit
22  No. 1 was marked for identification.)
23  MR. STRENGTH:  This is Bates

Page 35

1  number one through eighty-four.
2  MR. BROOKS:  That's correct.
3  Well, I was going to give her the one with
4  the exhibit sticker.  That's one for you to
5  keep just so you can look on as well.
6  Q.  I'm passing along to the witness
7  what I have marked as Defendant's Exhibit
8  1.  Would you like a chance to look through
9  that?  Take as much time as you need.
10  A.  Okay.
11  Q.  While you're looking, I'm going to
12  show you -- I only have one copy of this, so
13  I didn't produce it.  This is what the
14  original looks like if that jogs your memory
15  about a booklet.
16  A.  Okay.
17  Q.  Do you remember receiving a
18  booklet like this which is the same thing as
19  that except for it's been copied?
20  A.  The one that I had was green.
21  Q.  It was green?
22  A.  Uh-huh.
23  Q.  But it was the ITP Health and

Page 36

1  Welfare Fund?
2  A.  Yes.
3  Q.  When I say a booklet like this, I
4  believe -- it looks like the one that I gave
5  you is dated August 2004.  Obviously that
6  was after.  But it would have been a booklet
7  similar to this.  You said it was green?
8  A.  Yes, it was green.
9  Q.  Did it have ITP Health and Welfare
10  Fund on the front?
11  A.  Yes, it did.
12  Q.  Did you read that booklet?
13  A.  No, I did not.
14  Q.  Okay.  Did you keep that booklet
15  in your possession?
16  A.  Yes.
17  Q.  Do you still have it?
18  A.  Yes.
19  Q.  Okay.  Did you give that to your
20  -- Well, I don't think I've received what
21  you had.
22  MR. BROOKS:  I'd like -- I think
23  that my discovery request covered anything

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  that was received from ITP Health and
2  Welfare.
3      MR. STRENGTH: I don't think we
4  have a copy of that booklet. I don't have
5  it.
6      A. But I have one at home.
7      Q. You have one at home?
8      A. Yes.
9      MR. STRENGTH: You need to get it
10 to me.
11     THE WITNESS: Okay.
12     MR. BROOKS: I would just ask if
13 you guys would produce that to me.
14     MR. STRENGTH: Sure.
15     Q. What you're telling me is, you
16 kept the booklet. You believe it was green,
17 but you did not read through it?
18     A. No.
19     Q. Did you understand that you were a
20 member of the Union?
21     A. Yes.
22     Q. You did understand that. Okay.
23 When you had this meeting, was this the

Page 38

1  first time you had found out about the ITP
2  Health and Welfare Fund?
3      A. Yes.
4      Q. And what the terms of the plan
5  was?
6      A. Yes.
7      Q. What was your understanding of
8  what the ITP Health and Welfare Fund was?
9      A. To me, it was just having medical
10 benefits where I can go to the doctor or
11 whatever. I didn't take time to read the
12 booklet or nothing like that.
13     Q. But your understanding was, it was
14 to provide medical benefits?
15     A. Yes.
16     Q. Did anyone explain this booklet
17 that you received to you or the contents?
18     A. No.
19     Q. Did you ask anyone about it?
20     A. No.
21     Q. During your employment with Cantu
22 Services, did you discuss this booklet with
23 any person at ITPE?

Page 39

1      A. No.
2      Q. Did you discuss it with your
3  employer?
4      A. No.
5      Q. Did you discuss the ITPE Health
6  and Welfare plan with the Union or the Union
7  representatives?
8      A. No.
9      Q. So during the time -- After you
10 left Cantu Services and during your
11 employment with K.B. Toys, you did not have
12 -- your understanding was you didn't have
13 any health benefits at all?
14     A. Not any, none.
15     Q. And you knew -- you know, my notes
16 aren't clear. Did you quit your job with
17 Cantu Services to work for K.B. Toys?
18     A. Yes.
19     Q. Okay. With the promise that you
20 would receive health benefits?
21     A. Yes.
22     Q. Were those -- Did you believe
23 those benefits to be better than the ones

Page 40

1  you were receiving with Cantu Services?
2      A. No.
3      Q. No?
4      A. It was just mainly more money.
5      Q. Okay. A higher hourly wage?
6      A. Yes.
7      Q. Okay. When you -- You were laid
8  off at K.B. Toys. How did your employment
9  -- How did you come to work back again for
10 Central Alabama Food?
11     A. I left the job, right, and went
12 back and reapplied and they hired me back.
13     Q. You just reapplied for your old
14 job?
15     A. Yes.
16     Q. But this time, it was a different
17 employer at the time you applied?
18     A. At the time I applied, it was
19 still Cantu Services until Central Alabama
20 Food Service took over.
21     Q. Did they take over before the time
22 you applied -- When you actually started
23 working, did you start working for Cantu or

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  did you start working back again for Central
2  Alabama?
3      A.  Cantu.
4      Q.  Okay.
5      A.  Cantu Service.  And then later on,
6  Central Alabama Food Service got the
7  contract.
8      Q.  Do you remember how long that was?
9      A.  No.
10     Q.  Do you remember if it was a short
11 amount of time or a long amount of time?
12 You don't remember?
13     A.  I don't remember.
14     Q.  Okay.  When you started back to
15 work for I guess Cantu Services the second
16 time and then at some -- strike that
17 question.
18        Was your employment disrupted in
19 any way when the employment changed from
20 Cantu to Central Alabama --
21     A.  No.
22     Q.  -- or did you go on working just
23 like always?

Page 42

1      A.  Just went on working like always.
2      Q.  Did you keep the same supervisors?
3      A.  Yes.
4      Q.  Okay.  When you went to work for
5  Cantu Services for the second time which
6  transitioned into Central Alabama Food
7  Service, were you in that ITP Health and
8  Welfare Fund immediately?
9      A.  No.
10     Q.  You had to wait a certain amount
11 of time again?
12     A.  Yes.
13     Q.  Did you receive a booklet, another
14 booklet?  Did you have to fill out paperwork
15 to re-enroll back into ITP Health and
16 Welfare Fund?
17     A.  I think I did, yes.
18     Q.  Did you receive another booklet?
19     A.  Yes.
20     Q.  Okay.  Was it similar to the
21 booklet you had received before?
22     A.  Yes.
23     Q.  Do you remember what color the

Page 43

1  booklet was?
2      A.  Green.
3      Q.  It was another green booklet?
4      A.  Yes.
5      Q.  Okay.  And that date would have
6  been -- Would that have been in 2002?
7      A.  Yes.
8      Q.  And did you keep that green
9  booklet?
10     A.  That's the one that I have at the
11 house.
12     Q.  Okay.  The one that you have is
13 the one that you received -- not the one you
14 received for the first time you went to
15 Cantu, it's the one you received when you
16 went back to work there?
17     A.  Yes.
18     Q.  And that's the one you have at the
19 house?
20     A.  Yes.
21     Q.  Okay.  Did you read the booklet at
22 that time?
23     A.  No.

Page 44

1      Q.  Did you ask anyone to explain it
2  to you?
3      A.  No.
4      Q.  Did anyone try to explain it to
5  you?
6      A.  No.
7      Q.  Okay.  Do you remember the
8  paperwork that you filled out at that time?
9      A.  No.
10     Q.  I guess let's go back.  After you
11 were laid off at K.B. Toys, did you apply
12 for any jobs other than back with Cantu
13 Services?
14     A.  I went to the unemployment office
15 and did applications there.
16     Q.  Were you offered any job other
17 than with Cantu Services?
18     A.  No.
19     Q.  Okay.  Were you receiving any
20 medical benefits after you left K.B and
21 before you went to work for Cantu Services?
22     A.  Rephrase that question.
23     Q.  Okay.  After the time you were

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1  laid off at K.B. Toys and before you went to
2  work for Cantu Services for the second time,
3  were you receiving any type of medical
4  benefits --
5     A.  No.
6     Q.  -- from any source?
7     A.  No.
8     Q.  Upon your departure from Cantu
9  Services for the first time when you left to
10  go to K.B. Toys, was there any discussion of
11  your health and welfare fund, the benefits
12  or how they were affected by your leaving
13  the company?
14     A.  No.
15     Q.  No.  And when you were terminated
16  by Central Alabama Food, was there any
17  discussion from anyone about the benefits or
18  what -- or the status of your benefits upon
19  termination?
20     A.  They told me that my benefits
21  ended the day of my termination.
22     Q.  Okay.
23        (Whereupon, Defendant's Exhibit

Page 46

1  No. 2 was marked for identification.)
2     Q.  I'm handing you Defendant's
3  Exhibit 2.  I'll represent to you that these
4  are the discovery responses that we received
5  from your attorney, including the documents
6  that were attached.  If you'd like time to
7  look through there, please feel free.
8     A.  Okay.
9     Q.  There's no page number.  But is
10  that your signature on the eleventh page?
11     A.  Yes.
12     Q.  I'm going to ask you first, I
13  guess, to direct your attention towards the
14  interrogatories which are the one, two,
15  three, four, first five pages of the
16  responses to the interrogatories.
17        I'd like you to just read through
18  those again and make sure that there's --
19  that these responses are accurate.  And you
20  can also -- if they refer to documents, you
21  can take your time to look at the documents
22  that are attached.
23        I just want to make sure that

Page 47

1  we've gotten all the information.  So if you
2  could look through those and make sure you
3  agree with all the answers.  And please take
4  as much time as you need to read back
5  through the interrogatories.
6     A.  Okay.
7     Q.  Do you have anything to add to
8  those interrogatory responses?
9     A.  No.
10     Q.  Okay.  If you could look at number
11  three real quick.
12     A.  Which page?
13     Q.  Well, there are no page numbers.
14  But it's on the second page.  I believe it's
15  at the top of the second page.
16     A.  Okay.  I see.
17     Q.  The answers -- the damages are
18  detailed in the attached documents.  So do
19  -- the attached documents, there are
20  statements of amounts that you owe from
21  different hospitals or not necessarily
22  hospitals, but medical --
23        MR. STRENGTH:  Providers.

Page 48

1     Q.  Medical providers, facilities.  I
2  just want to make sure that we have all the
3  amounts that you owe that you're claiming as
4  damages that come from the debts that you
5  owe as a result of the surgery, to make sure
6  that they are in here.
7        I guess I'll go through the first
8  attached -- let's see.  It will be the third
9  attached document.  We'll look at the
10  receipts for now.  Or not the receipts --
11  excuse me -- the statements.
12        You owe ninety-one dollars to
13  Radiology Group.  Do you still owe that
14  amount?
15     A.  Yes.
16     Q.  Okay.  Do you owe any more than
17  that amount to your knowledge to Radiology
18  Group?
19     A.  Not to my knowledge.
20     Q.  Okay.  And there's several
21  different documents in here referencing that
22  same ninety-one dollars that you owe;
23  correct?  If you'll look through there.

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  There's a letter to your attorney after the
2  two explanation of benefits. But that's the
3  same ninety-one dollars?
4      A. I think so.
5      Q. Okay. Now, if you will, turn to
6  the page that is entitled on the top right
7  -- it says Montgomery Anesthesia
8  Associates.
9      A. If I can find it.
10     Q. The top right.
11     A. Okay. I've got it.
12     Q. You have found that?
13     A. Yes.
14     Q. And that says that you owe one
15  thousand seven hundred and forty dollars.
16  Is that the amount that you understand that
17  you owe to Montgomery Anesthesia Associates?
18     A. Yes.
19     Q. Okay. The next page is Advanced
20  Surgical Associates. I can't read that
21  page. But I think there's another page from
22  them later on, if you'll flip a couple of
23  pages after that.

Page 50

1          You see the page that -- it's
2  entitled Advanced Surgical Associates at the
3  top. Well, if you'll page over a couple
4  after that -- that one is hard to read. But
5  I think there's another statement from them
6  that's easier to read.
7          It would be after that, after that
8  page. Three or four pages after. It's just
9  hard to read the amount on that page. So I
10 think there's another statement.
11     A. Okay.
12     Q. Do you see? And Advanced Surgical
13 Associates, it says you owe three thousand
14 eight eighty-two, eighteen. Is that the
15 amount that you understand that you owe to
16 Advanced Surgical Associates?
17     A. Yes.
18     Q. Do you still owe that amount?
19     A. Yes.
20     Q. Okay. Now, you still owe one
21 thousand seven hundred and forty dollars to
22 Montgomery Anesthesia?
23     A. Yes.

Page 51

1      Q. And the next page says Jackson
2  Hospital. And the balance at the top right,
3  it says twenty thousand five hundred and
4  eighty dollars and fifty cents?
5      A. Yes.
6      Q. Is that the amount that you
7  understand you owe to Jackson Hospital?
8      A. Yes.
9      Q. Okay. Do you still owe that
10 amount to Jackson Hospital?
11     A. Yes.
12     Q. Okay.
13         MR. STRENGTH: Just so there's no
14 confusion, she's been sued -- I think we've
15 provided that. She's been sued by Jackson
16 Hospital. I think they also have claimed
17 some attorney's fees and filing fees and
18 stuff like that.
19         There may be in addition to that
20 -- there's probably an additional amount
21 she's been sued for on top of that, not for
22 services, but for collection stuff.
23         MR. BROOKS: Okay.

Page 52

1          MR. STRENGTH: And I'm not even
2  sure that we know what that is because the
3  lawsuits --
4          MR. BROOKS: That's the lawsuit
5  that's -- the administrative --
6          MR. STRENGTH: Yes.
7          MR. BROOKS: I saw those documents
8  that you produced.
9      Q. But this is the amount for the
10 medical services?
11     A. Yes.
12     Q. Okay. Besides these four amounts,
13 are there any other amounts that you are
14 claiming for medical services as a result --
15 that were not paid by ITPE that you feel
16 should be paid?
17     A. Not that I can recall.
18     Q. Okay. Are all of these -- Are all
19 of these bills related to the gastric bypass
20 surgery?
21     A. Yes.
22     Q. That occurred, I guess -- Was it
23 on or about January 30th, 2004?

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1    A.  Yes.
2    Q.  Okay.  I believe that's the right
3   date.  What is your understanding of what
4   that gastric bypass surgery is?
5    A.  To my understanding, it was a
6   surgery that you have in order to lose
7   weight and stuff.  And that's my
8   understanding of it.
9    Q.  Okay.  Why did you have that
10  surgery?
11   A.  I have had diabetes.  And since
12  I've had the surgery, I don't have to take
13  medicine for it no more.
14   Q.  Do you still have diabetes?
15   A.  No.
16   Q.  Okay.  Has the doctor told you you
17  don't have diabetes?
18   A.  My A1-C levels she said is
19  perfect.
20   Q.  Okay.  Who told you that?
21   A.  My doctor.
22   Q.  Okay.  What doctor?
23   A.  Dr. Mulles.

Page 54

1    Q.  Dr. what?
2    A.  M-U-L-L-E-S.
3    Q.  Is he a doctor here in Montgomery?
4    A.  Yes.  She is.
5    Q.  She is.  Excuse me.
6    (Whereupon, Defendant's Exhibit
7   No. 3 was marked for identification.)
8    Q.  I'm handing you Defendant's
9   Exhibit 3.
10   MR. BROOKS:  And, Brian, these are
11  medical records I received upon my subpoena
12  that I sent out.
13   Q.  These I'll represent to you are
14  billing, I guess, records from Jackson
15  Hospital.  The amount on the first page
16  after the cover page that says -- it's the
17  same amount that we had earlier, twenty
18  thousand five eighty fifty.  That's a result
19  of your gastric bypass surgery; correct?
20   A.  Yes.
21   Q.  Are any of the other pages show
22  amounts that you owe -- Do any of the other
23  pages reflect amounts that you owe for the

Page 55

1   gastric bypass surgery?
2    A.  Can you rephrase that question.
3    Q.  Okay.  There are other bills, most
4   of which say you don't owe any money
5   anymore.  My question is, do any bills -- do
6   any of these documents reflect amounts that
7   you owe?
8    Well, here, let's strike that.
9   All the pages say that the total amount due
10  is zero zero I believe except for the second
11  to the last page, other than the first page
12  where it says you owe the twenty thousand
13  five eighty fifty.
14   It says that you owe seventy
15  dollars and fifteen cents.  And this is for
16  it looks like admit date 8-21-01, discharge
17  date, 8-31-01 at the top.  The second to the
18  last page.
19   A.  Oh, okay.
20   Q.  Would that have anything to do
21  with your gastric bypass surgery?
22   A.  No.
23   Q.  So that would not be an amount

Page 56

1   that you're seeking in this lawsuit?
2    A.  No.
3    Q.  And other than the first page with
4   twenty-five eighty, all the others say total
5   amount zero; correct, the total amounts due
6   at the bottom of the page?
7    A.  Yes.
8    Q.  The only amounts due for your
9   gastric bypass is the amount on the first
10  page -- on the first -- on the -- the pages
11  aren't numbered.  But it's the page directly
12  after the certification, the second page
13  where it says you owe twenty thousand five
14  hundred and eighty dollars and fifteen
15  cents?
16   A.  Yes.
17   Q.  None of those other pages reflect
18  amounts that you're seeking in this lawsuit?
19   A.  No.
20   (Whereupon, Defendant's Exhibit
21  No. 4 was marked for identification.)
22   Q.  I'm handing you another set of
23  documents I received from Jackson Hospital.

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

Page 57

1  I'm also handing you a -- and that's -- I've
2  marked that as Defendant's Exhibit 4. I'm
3  also handing a set to your attorney.
4        MR. STRENGTH:  This is going to be
5  4?
6        MR. BROOKS:  Correct.
7        Q.  If you could turn to page -- There
8  are numbers at the bottom of the pages.
9        A.  Okay.
10       Q.  If you could turn to page
11 twenty-four.  I guess that would be the
12 first twenty-four because they are numbered
13 for each account.
14       And the first account is I believe
15 one oh six oh six one three five.  So it
16 would be the first set of documents number
17 twenty-four in there.
18       If you'd just look at the bottom
19 of the page.  And the top of it says Jackson
20 Hospital Clinic, printed Monday, February
21 2nd, 2004.  Is that where you are?
22       A.  Yes.
23       Q.  And it says date of procedure,

Page 58

1  January 30th, 2004?
2        A.  Uh-huh.
3        Q.  Was that the day of your gastric
4  bypass surgery?
5        A.  Yes.
6        Q.  Okay.  And the preoperative
7  diagnosis is morbid obesity?
8        A.  Yes.
9        Q.  Okay.  So that's what you
10 understood that you were diagnosed -- your
11 diagnosis was?  Did you understand that you
12 were diagnosed as morbid obesity?
13       A.  Yes.
14       Q.  Okay.  And your surgery was meant
15 to treat that?
16       A.  Yes.
17       Q.  To treat morbid obesity.  Okay.
18 When I say your surgery, I mean your gastric
19 bypass surgery; correct?
20       A.  Yes.
21       Q.  If you go back up to page -- I
22 guess it's page zero one, it says patient
23 information.  It lists -- It has your admit

Page 59

1  date as 1-30, 2004.  It has your employer
2  here as -- if you look in the middle of the
3  page, it says Cantu Services.
4        Were you actually employed -- It
5  had actually changed over to Central Alabama
6  Food Services by then or do you know?
7        A.  It had changed over to Central
8  Alabama.  No, it didn't.  I don't think it
9  did.  I don't think it did to my --
10       Q.  Or if you're not sure, I mean
11 that's fine.
12       A.  I'm not sure.
13       Q.  You're not sure?
14       A.  No.
15       Q.  Okay.  Under it, it says insured
16 number one, ITP Health and Welfare Fund.
17 Number two, it says private pay after
18 insurance.
19       Does that mean -- Was there any
20 other entity that would pay or does private
21 pay mean that you would be responsible for
22 paying the amounts not covered by any
23 insurance?

Page 60

1        A.  Rephrase the question.
2        Q.  You're right.  That was
3  confusing.  That's fair.  Fair enough.  Was
4  there any other person or entity or business
5  that was responsible that you believed or
6  thought would be -- would be responsible for
7  this surgery other than ITP Health and
8  Welfare Fund for paying your medical bills?
9        A.  No.
10       Q.  Okay.
11       (Whereupon, Defendant's Exhibit
12 No. 5 was marked for identification.)
13       Q.  I'm handing you Defendant's
14 Exhibit 5.  I'm handing your attorney a
15 copy.  It's also documents received from
16 Montgomery Anesthesia.  Would you like to --
17 There aren't very many.  Would you like to
18 look through these documents?
19       A.  Okay.
20       Q.  Do all of these -- Do all the
21 medical documents -- and I don't mean that
22 are attached -- refer to your gastric bypass
23 surgery?

15  (Pages 57 to 60)

Page 61

1    A.  Rephrase your question again for
2  me.
3    Q.  Okay.  In this lawsuit, you are
4  seeking amounts which you believe that ITPE
5  should pay as a result of your gastric --
6  relating to your gastric bypass surgery;
7  correct?
8    A.  Yes.
9    Q.  Okay.  Do all of the medical
10  documents in Defendant's Exhibit 5 relate to
11  that gastric bypass surgery that you are
12  seeking payment for that are the subject of
13  this lawsuit?
14    A.  Yes.
15    Q.  Okay.  If you'll look at the first
16  document, the first actual medical document,
17  which is the document after the order which
18  is a HIPPA order that they attached, if
19  you'll look at the document after that --
20  I'm not going to ask you about the order.
21    A.  Okay.
22    Q.  That looks like a statement of
23  amounts that again is the same seventeen

Page 62

1  forty that we discussed earlier from
2  Montgomery Anesthesia.  I have -- The date
3  this was printed out was -- it looks like
4  it's May 15, 2006 on the top.
5    On there it says bad debt
6  adjustment.  What is your understanding of
7  your status of your bill with Montgomery
8  Anesthesia?
9    A.  Rephrase your question to me.
10    Q.  Has Montgomery Anesthesia sent
11  anything to you -- this is the page right
12  here.  Okay -- that -- or do you understand
13  that you no longer owe them seventeen forty?
14    A.  I didn't know that.  To my
15  understanding, I still owe them.
16    Q.  Your understanding is that you
17  still owe that.  Do you remember receiving
18  this statement?
19    A.  No.
20    Q.  Have you received anything or
21  heard anything from them saying that you
22  don't owe seventeen forty anymore?
23    A.  No.

Page 63

1    Q.  Okay.
2    (Whereupon, Defendant's Exhibit
3  No. 6 was marked for identification.)
4    Q.  I'm handing you Defendant's
5  Exhibit 6 and I'm handing a copy to your
6  attorney as well.  It's entitled at the top
7  purged account inquiry.
8    It lists amounts from 2001.  Were
9  those amounts related to a car accident that
10  you had from 2001?
11    A.  I was in a car accident.
12    Q.  I'm sorry?
13    A.  I was in a car accident, yes, in
14  2001.
15    Q.  You were?
16    A.  Yes.
17    Q.  On the very first page, it has
18  something about a knee, cervical, forearm,
19  chest and some type of reference to an
20  insurance payment and a law firm and State
21  Farm Insurance.
22    And the amounts are in 2001.  So
23  that doesn't have anything to do with the

Page 64

1  gastric bypass surgery?
2    A.  No.
3    Q.  Okay.  I don't have any other
4  questions with that exhibit.
5    (Whereupon, Defendant's Exhibit
6  No. 7 was marked for identification.)
7    Q.  I'm handing you Defendant's
8  Exhibit 7.  And I'm handing your attorney
9  also a copy.  These are documents received
10  from Advanced Surgical Associates.  If you
11  could look through those documents.
12    A.  Okay.
13    Q.  Is Dr. Williams, is he your
14  regular physician?
15    A.  No.
16    Q.  No.  Okay.  Were you referred to
17  Dr. Williams by your physician?
18    A.  I talked to her about it.  And I
19  kind of pretty much went on my own with it.
20    Q.  When you say talked to her, what
21  did you talk about?
22    A.  I talked with Dr. Mulles about
23  having the surgery done.  She said it was

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  okay. And so I seeked out on my own and
2  made my appointment.
3      Q.  Okay. If you could tell me, what
4  were your specific discussions with Dr.
5  Mulles?
6      A.  Mulles.
7      Q.  Mulles.
8      A.  She's been my physician for a
9  couple of years and she know my medical
10  history and everything. And I explained it
11  to her. I told her I was thinking about
12  having gastric bypass surgery. And we
13  talked and she discussed.
14      She said with my medical condition
15  and stuff, it was fine if I did go on ahead
16  and have the surgery. So I made an
17  appointment to see Dr. Williams.
18      Q.  Was it your idea to have gastric
19  bypass or was it yours?
20      A.  It was mine. My idea.
21      Q.  What prompted you to --
22      A.  Because of my medical condition I
23  had. Like I said, I had suffered from

Page 66

1  diabetes and high cholesterol, all that
2  stuff.
3      And that's why I seeked out to go
4  see him in order to lose the weight so I
5  could kind of eliminate some of the problems
6  that I was having, medical problems.
7      Q.  What was your understanding of
8  what the gastric bypass surgery would
9  accomplish?
10      A.  Losing the weight and getting some
11  of my medical conditions under control, my
12  medical problems under control.
13      Q.  Okay. The gastric bypass would
14  help you lose weight?
15      A.  Yes.
16      Q.  Okay. The medical records in
17  Defendant's Exhibit 7, do they relate to
18  your decision to the gastric bypass and your
19  visits to your doctor relating to your
20  gastric bypass surgery?
21      A.  Yes.
22      Q.  And you recognize these documents
23  or a lot of these documents?

Page 67

1      A.  No.
2      Q.  Okay. For example, the diagnosis
3  that you see on here, is it consistent with
4  what he told you? I mean, did Dr. Williams
5  tell you you had morbid obesity?
6      A.  Yes, he did.
7      Q.  All right.
8      MR. BROOKS:  Mind if I take a
9  break.
10      MR. STRENGTH:  Not at all.
11      (Whereupon, a short recess was
12  taken.)
13      Q.  I want to go back because I think
14  I forgot to ask one -- go back to
15  Defendant's Exhibit 2, if you can fish that
16  out of your stack.
17      MR. STRENGTH:  Back on 2?
18      MR. BROOKS:  Back on 2.
19      Q.  I asked you about your
20  interrogatory responses which were the first
21  I think five pages. I think starting on the
22  six page, it says documents requested. And
23  it goes one through it looks like

Page 68

1  twenty-nine. I'll let you find it.
2      If you could look through -- look
3  through -- the responses to all of them I
4  believe are either see attached or none.
5  And then there are documents attached at the
6  end.
7      So I want to make sure. If you
8  could look through those and make sure that
9  they are accurate. For example, if you look
10  at number one, it says all documents in your
11  possession that relate to the Defendant
12  which is ITPE.
13      You've told me that you have a
14  booklet that you're going to give your
15  attorney to produce to me.
16      A.  Yes.
17      Q.  So that would be -- Other than
18  producing that booklet which we've already
19  discussed, if you could look through one
20  through twenty-nine and make sure all of
21  those answers are accurate. And you can
22  take as much time as you need.
23      A.  Okay.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1   Q. Are all of those answers correct?
2   A. Yes.
3   Q. Okay. Just keep that there. We
4   may look back at some of those documents in
5   a second that are attached. So keep that on
6   top.
7   A. Okay.
8   Q. When did you decide to have a
9   gastric bypass surgery? Around what time
10  was that decision made that you wanted to
11  have that surgery?
12  A. I had it done in 2004. So it was
13  sometime in 2003.
14  Q. It was done on January 30th, 2004;
15  correct?
16  A. Yes.
17  Q. Okay. Was the decision maybe in
18  late 2003 or do you remember the time
19  period?
20  A. Probably -- I think it was kind of
21  the beginning of 2003.
22  Q. Okay. Were you employed at the
23  time you made that decision?

Page 70

1   A. Yes.
2   Q. And who were you employed by?
3   A. Cantu.
4   Q. Cantu?
5   A. Yes.
6   Q. And were you participating in ITPE
7   Health and Welfare Fund at that time?
8   A. Yes.
9   Q. Okay. Did you take any -- Did you
10  take any steps to see if ITPE Health and
11  Welfare Fund would pay for the gastric
12  bypass surgery?
13  A. No.
14  Q. Okay. You didn't?
15  A. Huh-uh.
16  Q. Okay. Did anyone else take any
17  steps to determine whether it was covered?
18  A. Yes.
19  Q. Okay. Who did?
20  A. Jennifer at Dr. Williams' office.
21  Q. Okay. Did Dr. Williams do the
22  surgery?
23  A. Yes.

Page 71

1   Q. Okay. How did it come about that
2   she took -- She took the steps. Why did she
3   do it I guess instead of you or did you ask
4   her to?
5   A. She's like his assistant.
6   Q. Okay.
7   A. And she took care of all that
8   stuff to make sure everything was covered
9   through insurance before the surgery is
10  done.
11  Q. Okay.
12  A. So she inquired, called the
13  insurance and talked to them.
14  Q. When you say the insurance, are
15  you referring to ITPE?
16  A. Yes.
17  Q. She called them. Did she tell you
18  she was going to call them before she did?
19  A. Yes.
20  Q. What did she tell you after she
21  called them?
22  A. They said they didn't need no type
23  of pre-authorization.

Page 72

1   Q. Okay. Did you read the booklet
2   that you have in your possession to see if
3   it was covered?
4   A. No.
5   Q. Did you give a copy of the booklet
6   to Ms. -- did you say her name was --
7   A. Jennifer -- I can't -- Owens --
8   Owes I think is her last name. I know her
9   first name is Jennifer.
10  Q. She's referred to in number one of
11  the interrogatories. If you look at Exhibit
12  2, there's a person referred, Jennifer P.
13  O-W-E-S?
14  A. Yes.
15  Q. Is that the person you're
16  referring to?
17  A. Yes.
18  Q. You did not give a copy of the
19  booklet to her?
20  A. No.
21  Q. Did you tell her that a booklet
22  existed?
23  A. No.

18 (Pages 69 to 72)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 73

1    Q.  That you had been given?
2    A.  No.
3    Q.  Okay.  Did anyone else provide a
4  booklet to her to your knowledge?
5    A.  No.
6    Q.  Okay.  So did you give the plant
7  booklet to anybody other than Ms. Owes to
8  review?
9    A.  No.
10    Q.  Other than making the phone -- Did
11  she tell you who she spoke to?
12    A.  Yes.
13    Q.  Who did she say she spoke to?
14    A.  To a Kathy, Kathy Herring.  I
15  think that's her name.
16    Q.  Okay.  Was that the first time --
17  How many times did you understand that she
18  called ITPE?
19    A.  From my understanding, I think she
20  talked to them three times.  And she even
21  called a couple of days before my scheduled
22  -- before my surgery was scheduled.
23    Q.  She called three times.  The first

Page 74

1  time was when?
2    A.  I can't recall.
3    Q.  Would it have been in 2003?
4    A.  Yes.
5    Q.  Okay.
6    A.  I think.
7    Q.  And the purpose of that call was
8  to --
9    A.  I guess to get the
10  pre-authorization or whatever.  I don't
11  know.
12    Q.  Do you know who she spoke to the
13  first time she called?
14    A.  Kathy.
15    Q.  And then when was the second time
16  she called?
17    A.  I can't recall the date.
18    Q.  Was it before your surgery?
19    A.  Yes.
20    Q.  The second time?
21    A.  Yes.
22    Q.  And who did she speak with the
23  second time?

Page 75

1    A.  Kathy.
2    Q.  Okay.  What did Kathy tell her?
3  You've already told us what she told the
4  first time, the first call.  What about the
5  second call?
6    A.  Well, she just said that they
7  didn't need no type of pre-authorization.
8    Q.  She called again and asked the
9  same question?
10    A.  Yes.
11    Q.  And your understanding was, she
12  was told she didn't need any
13  pre-authorization?
14    A.  Yes.
15    Q.  Anything else?
16    A.  No.
17    Q.  Okay.  What about the third time?
18  Do you know when she called the third time?
19    A.  From my understanding, when I
20  talked to her, she told me she called a
21  couple of days before my surgery was
22  scheduled to be for sure.
23    Q.  Was that the second time?

Page 76

1    A.  The third time.  The third time
2  before my date for me to have my surgery.
3  She called a third time and talked to them.
4    Q.  Okay.
5    A.  And to make sure everything was
6  okay.  And she still told her the same
7  thing.
8    Q.  Okay.  And the same thing being?
9    A.  No pre-authorization, you know.
10    Q.  So she called -- This Jennifer,
11  she called three times before your surgery?
12    A.  Yes.
13    Q.  Did she call after the surgery to
14  your knowledge?
15    A.  Yes, I think she did.
16    Q.  So that would be a fourth time?
17    A.  Yes.
18    Q.  Okay.  What happened the fourth
19  time she called her?  Did she talk to you
20  about the fourth time that she called?
21    A.  Yes.
22    Q.  What did she tell you?
23    A.  She talked -- She said she talked

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 77

1  to them about getting the bill and stuff
2  taken care of.
3      Q.  Okay.
4      A.  My medical bills and stuff paid.
5      Q.  What prompted her to call the
6  fourth time?
7      A.  When I told her that they didn't
8  pay for the surgery.
9      Q.  Okay.  How did you communicate
10  with her?
11      A.  Over the phone.
12      Q.  Okay.  How did you find out that
13  the bills weren't paid?
14      A.  Approximately a week and a half
15  after I had the surgery, I called and talked
16  to her.  The lady's name was Jan.  I can't
17  remember her last name.
18          And I was inquiring about my --
19  like disability pay, you know, where, you
20  know -- there was a thing in our insurance
21  where if you be off on medical reason, that
22  they'll, you know, pay you some while you're
23  off.

Page 78

1          And so when I called and talked to
2  her, she told me, oh, we don't pay for that
3  type of surgery.  And that's when I found
4  out then.
5      Q.  Okay.  You say the person's name
6  was Jan?
7      A.  Yes.
8      Q.  Did Jan work for ITPE?
9      A.  Yes.
10      Q.  Okay.  Do you know what her
11  position was at ITPE?
12      A.  No.
13      Q.  How did you come to talk to her?
14  I mean, what number -- I mean, how did you
15  come to talk to her?
16      A.  When I called and -- this Kathy
17  usually be the one that -- I guess because
18  of my -- the last alphabet of my name, she's
19  the one I usually talk to.
20          So I don't know how -- I don't
21  know how Jan ended up -- you know, me
22  talking to her that day when I called.
23  Maybe because Kathy wasn't at her desk at

Page 79

1  the time.
2      Q.  Okay.  Have you talked to anybody
3  at ITPE besides Kathy or Jan?
4      A.  No.
5      Q.  What about -- To your knowledge,
6  did Jennifer talk to anybody at ITPE besides
7  -- did she talk to anybody besides Kathy?
8      A.  I don't know.
9      Q.  You don't know.  Okay.  Well, then
10  she told you who did she talk to?
11      A.  She only told me she talked to
12  Kathy.
13      Q.  Okay.  So you called a couple of
14  weeks after about disability?
15      A.  Yes.
16      Q.  And you were told that the gastric
17  bypass wasn't covered?
18      A.  Yes.
19      Q.  By a person named Jan?
20      A.  Yes.
21      Q.  What did you do after that?
22      A.  I had to lay down because it
23  destroyed me because I knew I had these

Page 80

1  outstanding bills facing me.
2      Q.  Okay.
3      A.  And I just laid back down, you
4  know.
5      Q.  Did you receive anything in
6  writing?
7      A.  No.
8      Q.  Will you look back at Defendant's
9  Exhibit 2.  These are documents that your
10  attorney produced.  There are two documents
11  that are right in the middle of the page
12  that says explanation of benefits.
13      A.  Okay.
14      Q.  Do you see that?  There are two
15  pages in a row.  There may be one before
16  that.
17      A.  Okay.
18      Q.  The first one, the date is 3-19,
19  2004 at the top.
20      A.  Uh-huh.
21      Q.  You see that?
22      A.  Yes.
23      Q.  It's from ITPE Health and Welfare

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  Fund. It's to your address. Do you see
2  your address at the top of the page?
3      A.  Yes.
4      Q.  Okay.  Did you receive that?
5      A.  Yes.
6      Q.  Okay.  So does this refresh your
7  memory about receiving something in writing?
8      A.  Yes.  I'm thinking maybe it
9  probably would have been a statement or
10 something that was wrote out.  But I did get
11 these.
12     Q.  You got the statement that was
13 dated 3-19, 2004 which is an explanation of
14 benefits?
15     A.  Yes.
16     Q.  And under it, it says -- and the
17 provider name on that document is Montgomery
18 Anesthesia if you look under provider name?
19     A.  Okay.
20     Q.  Do you see provider name?
21     A.  Yes.
22     Q.  Okay.  And on the next page, it's
23 dated 3-17, 2004 and explanation of

Page 82

1  benefits?
2      A.  Yes.
3      Q.  And it's addressed to you?
4      A.  Yes.
5      Q.  And that's your correct address on
6  there?
7      A.  At the time, yes.
8      Q.  Oh, yes.  I'm sorry.  At the
9  time.  And you received that?
10     A.  Yes.
11     Q.  You received that on or around the
12 dates of the notice?
13     A.  Yes.
14     Q.  Okay.  And the provider names they
15 discussed in here is Jackson Hospital and
16 Clinic and Advanced Surgical Associates?
17     A.  Yes.
18     Q.  Okay.  Did you read these
19 documents when you received them?
20     A.  The explanation of benefits?
21     Q.  Correct.
22     A.  No, I didn't.  At the time, I
23 didn't.

Page 83

1      Q.  So did you look at the bottom
2  where it says appeal information?  Do you
3  see that right now?
4      A.  Yes.
5      Q.  It says you have the right to
6  appeal our decision to deny a claim?
7      A.  Yes, I see that.
8      Q.  Okay.  Did you read that?
9      A.  No.  At the time, no.
10     Q.  Did you ever take any steps to
11 appeal this decision?
12     A.  No.
13     Q.  The decision I guess in the
14 explanation of benefits dated 3-19 and the
15 one dated 3-17 -- on the page right after
16 3-17, 2004 and 3-19, did you take -- I guess
17 these are two separate documents.  Did you
18 take any steps to appeal these decisions?
19     A.  No.
20     Q.  Okay.  After you received this,
21 did you look in your claims booklet to see
22 why your claim was denied?
23     A.  No, I didn't.

Page 84

1      Q.  Okay.  Did you understand -- What
2  was your understanding of why your claim was
3  denied?
4      A.  From talking to Jan on the phone,
5  she -- they just told me that they didn't
6  cover it, cover the surgery.
7      Q.  Okay.  Was it your understanding
8  that weight loss and weight reduction -- I
9  guess I'm reading.  Excuse me.  I'm reading
10 off the explanation of benefits dated 3-19,
11 2004.  Are you on that page?
12     A.  Yes.
13     Q.  Okay.  On there it says, weight
14 loss and weight reduction services are not
15 an eligible benefit.  Was that your
16 understanding at the time?
17     A.  At the time, no.
18     Q.  Is that your understanding of
19 their reason for denying your claim?
20     A.  Yes.
21     Q.  Okay.  Other than the filing of
22 this lawsuit, what steps did you take after
23 receiving these two documents to obtain

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  payment of your -- of these medical bills?
2      A.  Rephrase the question.
3      Q.  Okay.  I'm sorry.  Other than I
4  guess the filing of the lawsuit, which is
5  why we're here today, what steps did you
6  take to try to obtain payment by ITPE Health
7  and Welfare Fund of these medical bills?
8      A.  I didn't take any steps.  I just
9  went straight to my attorney.
10     Q.  Don't tell me what you said to
11 your attorney.
12     A.  Okay.
13     Q.  I don't want to know.  None of my
14 questions involve any of your conversations
15 with your attorney.  So please don't tell me
16 because I'm not asking that.  Okay.  All
17 right.
18          Other than your attorney, did your
19 attorney -- did any attorney file -- other
20 than the lawsuit, what do you understand --
21 Well, has anything been filed on your behalf
22 other than this lawsuit to contest the
23 non-payment of these medical bills?

Page 86

1      A.  Jennifer had talked to them again
2  afterwards.
3      Q.  Okay.
4      A.  About the insurance company paying
5  the bill.  And they still denied it.
6      Q.  Well, tell me what -- okay.  You
7  found out that these weren't covered, that
8  Jan told you that the surgery wasn't covered
9  and you received these documents right here?
10     A.  After the surgery, yes.
11     Q.  Okay.  Did you call Jennifer and
12 tell her what you found out?
13     A.  Yes.
14     Q.  Okay.  And what did Jennifer do?
15     A.  She called them back to see, you
16 know, whether they covered the surgery
17 because that's -- to my understanding, you
18 know, that was what they was going to do.
19 And they still denied her.
20     Q.  Other than -- And so she had a
21 conversation with them?
22     A.  Yes.
23     Q.  And what else did she do?

Page 87

1      A.  She sent me a letter with a
2  statement and stuff, what was said and that
3  was that.
4      Q.  Okay.  Other than what Jennifer --
5  Other than Jennifer's communications with
6  the ITPE Health and Welfare Fund and other
7  than the lawsuit filed on your behalf by
8  your attorney, what other steps have been
9  taken to contest the non-payment of the
10 medical bills?
11     A.  None.
12     Q.  None.  Okay.  Did Jennifer take
13 any other steps or have any other
14 communications other than what you have
15 already told me to your knowledge?
16     A.  Not to my knowledge.
17     Q.  Okay.  Have you ever consulted
18 that booklet -- During this entire time,
19 have you ever consulted the booklet to look
20 -- the booklet you received, the ITPE
21 booklet -- You said it was green I think?
22     A.  Yes.
23     Q.  Have you ever consulted it at any

Page 88

1  time after you decided to have gastric
2  bypass surgery?
3      A.  No, not after.  No, not after.  I
4  looked at it after I've had it done to see.
5  But I never looked at it before I had it
6  done.
7      Q.  You read it -- When did you read
8  it?
9      A.  After -- After I -- When they said
10 they wasn't going to pay, I just looked
11 through the book then to see what was what.
12     Q.  What did you find in there?
13     A.  I really didn't understand it.
14 And so I just -- I put the book down.
15     Q.  Did you give it to Jennifer?
16     A.  No.
17     Q.  Okay.  Have you given it to
18 anyone?
19     A.  No.
20     Q.  After you talked to Jan, the
21 discussion you told me about, have you had
22 any other communications with ITPE?
23     A.  No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1   Q.   No other communications?
2   A.   After I talked to Jan and then
3   Kathy, that was it.  If I had of called in
4   the past, it was probably about paying for
5   my medicine and stuff like that there and
6   where I had bought medicine and stuff and
7   they would reimburse me.
8   Q.   So has ITPE been making payments
9   for other benefits like medicine and other
10  medical -- medication and medical procedures
11  during this time -- excuse me -- during this
12  time -- Let me start that question over.
13       During the time -- From the time
14  you were employed by Cantu Services which
15  switched to Central Alabama until your
16  termination, was ITPE Health and Welfare
17  Fund, other than the gastric bypass, making
18  payments for medical procedures or
19  medicine?  You said you talked to them?
20  A.   Yes.  Medicines.  Some of my
21  medicine and stuff that I was getting.
22  Q.   During that time, what other types
23  of payments were they making?  When I say --

Page 90

1   excuse me -- What other types of payments
2   was ITPE making for your medical procedures
3   or medication?
4   A.   They -- Some for my medication and
5   then some for dental work, too, that I had
6   done.
7   Q.   Okay.
8   A.   Yes.
9   Q.   Okay.  Anything else that you can
10  remember?
11  A.   No.
12  Q.   Okay.  And that continued until
13  your employment terminated?
14  A.   Yes.
15  Q.   Did you discuss the non-payment
16  for the gastric bypass procedure, ITPE's
17  non-payment with anybody from the Union?
18  A.   No.
19  Q.   What about with your employer?
20  A.   No.
21  Q.   Other than your attorney and other
22  than Jennifer, which we've already
23  discussed, who have you discussed this with,

Page 91

1   this meaning the issue of ITPE not paying
2   for your gastric bypass procedure?
3   A.   No one.
4   Q.   Okay.  Do you have any children?
5   A.   No.
6   Q.   Are you currently married?
7   A.   No.
8   Q.   Have you been married in the past
9   six years?
10  A.   No.
11  Q.   Have you had any other
12  communications with ITPE about the gastric
13  bypass surgery or payment for the surgery
14  other than your conversation with Jan?
15  A.   No.
16  Q.   Okay.  Has Jennifer Owes had any
17  conversations other -- with ITPE other than
18  the ones you've described to your knowledge?
19  A.   No.
20  Q.   I think that's the second time
21  I've asked that question.  I apologize.  Has
22  anyone else -- Do you know of any other
23  conversations with ITPE other than the --

Page 92

1   about the gastric bypass from anyone other
2   than what you have described?
3   A.   No.
4   Q.   Okay.  And just so I'm clear, you
5   consulted the booklet that you received one
6   time and that was after you had been --
7   found out that you were denied, you read it
8   one time --
9   A.   Yes.
10  Q.   -- did not understand it, but did
11  not give it to anybody else to look at; is
12  that correct?
13  A.   Yes.
14  Q.   Okay.  But never -- But did not
15  consult it before you had the surgery?
16  A.   No, I did not --
17  Q.   Okay.
18  A.   -- look at the book before.
19  Q.   Did you look at the book -- Did
20  you read the book when you became employed?
21  A.   No.
22  Q.   Okay.  Or when you received the
23  booklet, did you read through it?

23  (Pages 89 to 92)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1    A.  No.
2    Q.  Either time, first or second time
3  you were employed by Cantu?
4    A.  No.  I didn't just read it.  Maybe
5  glanced through it, but not read the book.
6    Q.  Okay.  Did you read to see what
7  was covered or not covered when you looked
8  through it?
9    A.  No, I didn't.
10    Q.  Okay.
11        (Whereupon, Defendant's Exhibit
12  No. 8 was marked for identification.)
13    Q.  I'm handing the witness
14  Defendant's Exhibit 8.  Defendant's Exhibit
15  8 is the complaint that was filed in this
16  case.  Would you like a chance to look
17  through this before I ask questions?
18    A.  Uh-huh (Positive response).
19        MR. BROOKS:  Could we go off the
20  record?
21        MR. STRENGTH:  Yes.
22        (Whereupon, a brief recess was
23  taken.)

Page 94

1    Q.  Have you had a chance to review
2  the complaint?
3    A.  Yes.
4    Q.  Do you recognize this as the
5  complaint that was filed on your behalf?
6    A.  Yes.
7    Q.  Against ITPE Health and Welfare
8  Fund?
9    A.  Yes.
10    Q.  All right.  I'm going to ask you
11  some questions -- I'm going to ask you
12  questions about the -- I'm going to refer to
13  the paragraphs.  Which when I say paragraph,
14  that means the numbers that are out beside
15  each of the statements.
16    A.  Okay.
17    Q.  So I guess the first I was going
18  to ask about is paragraph four.  It says the
19  Plaintiff was covered under a health
20  insurance policy issued by Defendant.
21  Plaintiffs paid all of the necessary
22  premiums to keep the policy in force.
23        What was your understanding on how

Page 95

1  the premiums were paid or if you have any
2  understanding?
3    A.  We paid I think it was twenty-four
4  dollars a month.  That included Union dues
5  and insurance.  That's all my knowledge that
6  I knew what was what.
7    Q.  Is it your understanding that it
8  was withheld from your check or you --
9    A.  Yes.  They took it out of our
10  check.  So much out of our check.
11    Q.  Okay.
12    A.  I think it was like twenty-four or
13  twenty-five dollars a month.  They would
14  break it down.  Maybe twelve fifty these two
15  weeks, then twelve fifty the next.
16    Q.  Where did your understanding how
17  that worked come from?
18    A.  Rephrase that.
19    Q.  Okay.  You told me what your
20  understanding was about how your health
21  benefits were paid for.  Who told you that
22  or how did you obtain the understanding that
23  you just gave me?

Page 96

1    A.  I just always, you know -- I just
2  always paid that money and they would tell
3  us that that was our Union dues and our
4  insurance.  It covers our Union dues and our
5  insurance.
6    Q.  How did you know that it was
7  paid?  Was there a statement that you
8  received or --
9    A.  No.  No.  The Union
10  representative, he told me before, you know,
11  that that paid for our Union and our
12  insurance, Union dues and insurance.
13    Q.  When you say that, you're talking
14  about money which you believe was withheld
15  from your check?
16    A.  Yes.
17    Q.  Let's look at paragraph number
18  five.  The last sentence says, Defendant
19  represented to Plaintiff that the procedure
20  would be covered.  Are there any
21  representations other than the ones that you
22  have already testified to here today?
23    A.  Rephrase your question.

24  (Pages 93 to 96)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 97

1    Q.   You testified here today about a
2   number of things.  You testified about
3   statements that you understand were made to
4   Jennifer Owes.
5        And my question is -- This says
6   Defendant represented to Plaintiff that the
7   procedure would be covered.  The procedure
8   is the gastric bypass surgery.
9        My question is, are there any
10  representations that the ITPE Health and
11  Welfare Fund made about whether it would be
12  covered other than what you have already
13  testified to today?
14   A.   I kind of look confused when you
15  made that last statement.
16   Q.   All right.  You told me about
17  representations that you understand were --
18  that you understand were made by ITPE Health
19  -- representations, that's statements that
20  were made about whether the procedure was
21  going to be covered or whether any -- well,
22  I guess whether there needs to be any
23  pre-clearance.  Okay?

Page 98

1    A.   Okay.
2    Q.   Were there any statements made by
3   ITPE about whether the procedure would be
4   covered other than the ones that you have
5   already told me about?
6    A.   No, no other statements.
7    Q.   Okay.  In paragraph six it says,
8   Plaintiff has repeatedly made claims for
9   Defendant to honor the terms of the policy
10  and pay for the procedure.  It has refused.
11       Are there any claims that you have
12  made to ITPE Health and Welfare Fund to pay
13  for the procedure other than what you have
14  testified here today?
15   A.   No.
16   Q.   On paragraph seven it says,
17  Plaintiff depended on Defendant, Defendant
18  meaning ITPE Health and Welfare Fund,
19  Plaintiff being yourself, to advise her as
20  to insurance matters because of their
21  superior knowledge and position.
22       On what occasions did you rely on
23  ITPE Health and Welfare Fund for advice on

Page 99

1   insurance matters?
2    A.   I really didn't.  When I go --
3   Like when I went to the dentist, the nurse
4   always just checked on things, you know,
5   what was what.  Same thing with Jennifer at
6   Dr. Williams' office.
7        I relied on them to check to see
8   what was what because they had more
9   knowledge in dealing with the insurance than
10  I did.
11   Q.   Okay.  Anything else?
12   A.   No.
13   Q.   Number eight it says, based on the
14  representations made by Defendant, which is
15  ITPE, in the policy, Plaintiff agreed to
16  purchase.  What representations were made in
17  the policy?
18   A.   Rephrase that question.
19   Q.   Okay.  When you decided -- When
20  you decided to sign up -- When you became
21  employed by Cantu Services, did you have any
22  understanding about what ITPE -- what
23  medical procedures they covered for medical

Page 100

1   bills, what medical procedures or bills it
2   did not cover?
3    A.   I didn't know.
4    Q.   Okay.  At the time that you signed
5   the paperwork to become a participant in the
6   ITPE plan, did you know what medical
7   procedures it covered and medical bills it
8   covered and what medical bills it did not
9   cover?
10   A.   No, I did not.
11   Q.   Did you base your decision to
12  become employed with Cantu Services on your
13  understanding of what ITPE covered and what
14  it did not cover?
15   A.   No.
16   Q.   Okay.  Did you base your
17  participation in that plan on what -- on the
18  ITPE plan on what it covered and what it did
19  not cover?
20   A.   Repeat that.
21   Q.   When you signed up for the plan,
22  did you -- I think I've already asked this.
23  Did you even know what was covered and what

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1   wasn't covered?
2       A.  No, I didn't.
3       Q.  So since you didn't know what was
4   covered and what wasn't covered, then --
5   that's fine.  That answers my question.
6           If you'll look at paragraph ten.
7   Paragraph ten says, Defendant entered into a
8   pattern or practice of fraudulent conduct
9   which included a fraudulent practice on the
10  Plaintiff.
11          What knowledge or evidence do you
12  have of a fraudulent -- of a pattern or
13  practice of fraudulent conduct?
14      A.  I don't understand that question.
15      Q.  Okay.  Do you know what fraudulent
16  conduct is?
17      A.  No.
18      Q.  You don't?  Okay.  Do you know of
19  anyone else having claims not paid for what
20  you thought should have been paid?
21      A.  No.
22      Q.  You don't know of any other
23  instances for anybody, not just yourself?

Page 102

1       A.  No.
2       Q.  Okay.  If you could read
3   paragraphs fourteen through sixteen for me.
4   Take your time.  What do you know -- What
5   false representations were made in the
6   policy to your knowledge?
7       A.  Rephrase that question.
8       Q.  Okay.  Paragraph fourteen.  Do you
9   know when -- Do you know what the complaint
10  refers to when it refers to the policy?
11      A.  Uh-huh.
12      Q.  Okay.
13      A.  Yes.
14      Q.  What does it refer to?  What is it
15  in your mind, the policy?  What do you
16  understand the policy to be?  Do you
17  understand the policy to be the booklet that
18  you received?
19      A.  Yes.
20      Q.  Okay.  Do you know of any false
21  representations that were made in the
22  booklet, representations that were not true?
23      A.  Not to my knowledge.

Page 103

1       Q.  Okay.  Do you have any information
2   that ITPE knew it was making false
3   representations?
4       A.  Repeat that.
5       Q.  Do you have -- Well, you've
6   already said you don't know of false
7   representations in the policy.  Okay.
8   That's fine.  Strike that last question.
9           If you could look at paragraph
10  seventeen.  Paragraph seventeen appears to
11  state what you're alleging is your damages.
12      A.  Okay.
13      Q.  Okay.  It says Plaintiff paid
14  premium payments on a policy that was not as
15  promised.  Plaintiff lost the value of the
16  premium payments.  Do you know what the
17  value of the premium payments were?
18      A.  No.
19      Q.  Okay.  I guess that means you
20  don't know what the interest was either?
21      A.  No.
22      Q.  Okay.  When it says Plaintiff owes
23  over twenty thousand dollars for the

Page 104

1   procedure, that money is the four bills that
2   we discussed earlier that are attached to
3   your discovery responses?
4       A.  Yes.
5       Q.  The bill for ninety-one dollars,
6   the bill for seventeen hundred and forty
7   dollars, the bill for three thousand eight
8   eighty-two and eighteen cents and the bill
9   for twenty thousand five eighty and fifty.
10          The four bills, that is what
11  comprises your over twenty thousand dollars
12  for your procedure?
13      A.  Yes.
14      Q.  Okay.  It says Plaintiff has
15  suffered mental anguish and emotional
16  distress.  What mental anguish and emotional
17  distress have you suffered?
18      A.  Well, knowing that I've got these
19  outstanding debts facing me and I know -- if
20  I wasn't sure that they weren't going to pay
21  for the surgery, I wouldn't have had it.
22  But I've got this outstanding debt that I've
23  got to get paid out.

26  (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 105

1  And it bothers me. It worries me
2  because I know that they've got to have
3  their money. And they looking at me. And I
4  know I don't even have that type -- that
5  kind of money.
6  Q. Okay. Well, how has that affected
7  you?
8  A. It just -- I just worries about
9  getting that bill paid.
10  Q. Okay.
11  A. It just worrying really, you know,
12  knowing that I -- they have to be paid. And
13  like I said, I don't have that type of
14  money, you know, for to pay that bill like
15  that.
16  And it's just constant on me all
17  the time because I never know when they may
18  try to garnish me or anything for their
19  money.
20  Q. Anything else?
21  A. It's just -- no. It's just mainly
22  worrying about getting the bills paid.
23  Q. Have you sought any medical

## Page 106

1  treatment for mental anguish or emotional
2  distress?
3  A. Well, I take Zoloft anyway, an
4  anti-depression pill.
5  Q. How long have you taken Zoloft?
6  A. Maybe about two years. Probably
7  three. But within the last year or so, she
8  up'd my dosage.
9  Q. Okay. Why were you given --
10  prescribed Zoloft pills?
11  A. Because I was having anxiety --
12  panic attacks and stuff.
13  Q. Okay. Did your panic attacks
14  start before you had this surgery?
15  A. About a week before I had it, had
16  the surgery.
17  Q. It started before you had the
18  surgery?
19  A. Yes.
20  Q. And they've continued? Have they
21  stopped?
22  A. Since I've been on the medicine,
23  yes. But like I say, she had to up my

## Page 107

1  dosage after I had the surgery. I was
2  taking fifty milligrams. I take a hundred
3  and fifty milligrams now.
4  Q. Did she tell you why she up'd your
5  dosage?
6  A. No.
7  Q. Has Zoloft been effective in your
8  opinion?
9  A. Yes.
10  Q. Okay.
11  A. It has.
12  Q. So you don't have anxiety attacks
13  anymore?
14  A. No. Not as long as I take the
15  medicine.
16  Q. When's the last time you've had an
17  anxiety attack?
18  A. It's been a while. It's probably
19  been about two years ago. Two years ago. I
20  haven't been bothered with it too much.
21  Q. Okay. Other than what you have
22  already described, any other medical
23  treatment for mental anguish or emotional

## Page 108

1  distress?
2  A. No.
3  Q. Okay. It says Plaintiff was
4  otherwise injured and damaged. How have you
5  been -- to your knowledge, how have you been
6  otherwise injured and damaged other than
7  what's described previously in that same
8  paragraph?
9  A. I can't think of nothing else.
10  Q. Okay. If you'll look at paragraph
11  twenty-nine, it says Defendant has acted in
12  bad faith with regard to Plaintiffs. You're
13  the only plaintiff.
14  Other than the non-payment of the
15  medical bills that you seek, has ITPE acted
16  in bad faith in any other way besides -- in
17  your opinion besides your belief they should
18  have paid for the gastric bypass procedures?
19  A. No.
20  Q. Okay.
21  MR. BROOKS: Why don't we take a
22  break so I can look at all my stuff.
23  (Whereupon, a short recess was

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  taken.)
2  Q. At any time since you first began
3  employment with Cantu Services the first
4  time, have you had any coverage -- have you
5  had any government program, entity, anybody
6  covering your medical expenses other than
7  through your employer?
8  A. Well, yes.
9  Q. Okay.
10  A. I go to Lister Hill Clinic and
11  they -- it's not where I have to just pay
12  the full amount for my medicines and stuff.
13  Q. What is the Lister Hill Clinic?
14  A. It's a clinic here in Montgomery.
15  Q. Okay. And you visit the Lister
16  Hill Clinic? Did you visit it at all with
17  regard to your gastric bypass surgery?
18  A. Beg your pardon?
19  Q. Did any of your visits to the
20  Lister Hill Clinic involve the gastric
21  bypass surgery?
22  A. No.
23  Q. Okay. Other than the Lister Hill

Page 110

1  Clinic, has any other person, government
2  program, entity covered your medical bills
3  other than through your employer?
4  A. No.
5  Q. Okay. Are you aware of any other
6  person submitting claims for payment
7  relating to -- let me start that over.
8  Are you aware of any other person
9  who submitted a claim to ITPE Health and
10  Welfare Fund for payment for gastric bypass
11  surgery other than yourself?
12  A. No. I don't know of anyone else.
13  Q. Okay.
14  MR. BROOKS: That's all I have.
15  EXAMINATION BY MR. STRENGTH:
16  Q. I've got just a couple. Alice, I
17  believe Exhibit 2 has been identified as
18  Plaintiff's responses to the Defendant's
19  first interrogatories and request for
20  production.
21  As part of that Exhibit 2, there's
22  a letter to ITPE written by Jennifer Owes.
23  Do you see that?

Page 111

1  A. Yes.
2  Q. Did Jennifer write this letter
3  with your permission?
4  A. Yes.
5  Q. Did she tell you she was going to
6  write this letter?
7  A. Yes.
8  Q. The first line of the letter says
9  this letter is on behalf of Alice Brown; is
10  that correct?
11  A. Yes.
12  Q. All right. Was she writing this
13  letter as your representative?
14  A. Yes.
15  Q. And I believe you said she had
16  your permission to write it?
17  A. Yes.
18  Q. And your consent?
19  A. Yes.
20  MR. BROOKS: Object to the form.
21  Q. The letter contains a social
22  security number, 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. Is that your
23  social security number?

Page 112

1  A. Yes.
2  Q. The letter details some
3  conversations that Jennifer apparently had
4  with Cheryl?
5  A. Yes.
6  MR. BROOKS: Object to the form.
7  Q. Is that right? The letter also,
8  as I read it, asks ITPE to -- and I quote
9  from the letter -- reconsider your decision;
10  is that correct?
11  A. Yes.
12  MR. BROOKS: Object to the form.
13  Q. And was it your understanding --
14  Did you get a copy this letter?
15  A. Yes.
16  Q. And you knew that it was going to
17  be written; is that right?
18  A. Yes.
19  MR. BROOKS: Object to the form.
20  Q. After you received the letter, did
21  you have any problem with its contents?
22  A. No.
23  MR. BROOKS: Object to the form.

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1  Q.  Did Jennifer in your opinion or to
2  your knowledge misstate anything in the
3  letter?
4  A.  No.
5  MR. BROOKS:  Object to form.
6  Q.  After this letter was sent and you
7  received a copy of it, did you ever receive
8  anything else from ITPE explaining why the
9  claim had been denied?
10  A.  Nothing but those -- that
11  statement that I had gotten in the mail.
12  Q.  And by those, are you referring to
13  -- if you flip over in that same exhibit,
14  there's some explanation of benefits.  You
15  see those?
16  A.  Yes.
17  Q.  And I think they are dated a
18  couple of three days before Jennifer's
19  letter.  Did you receive those explanation
20  of benefits?
21  A.  Yes.
22  Q.  After you received those
23  explanation of benefits, did you call

Page 114

1  Jennifer to talk about the fact that you
2  weren't happy that the claim had been
3  denied?
4  MR. BROOKS:  Object to the form.
5  A.  Yes.
6  Q.  Did Jennifer tell you that she was
7  going to write a letter to try to get paid?
8  MR. BROOKS:  Object to form.
9  A.  Yes.
10  MR. STRENGTH:  That's all I have.
11  Thank you.
12  EXAMINATION BY MR. BROOKS:
13  Q.  I have some follow-up.  My
14  questions are directed towards the March
15  22nd letter that plaintiff's counsel was
16  referring to in his questions.  Are you
17  still looking at that letter?
18  A.  Yes.
19  Q.  You say you discussed -- you
20  discussed this letter with Ms. Owes before
21  she sent this letter?
22  A.  Yes.
23  Q.  Tell me about that discussion.

Page 115

1  A.  I talked to her and I told her
2  that they wasn't going to pay for the
3  surgery.
4  Q.  Okay.
5  A.  And she said that she'll represent
6  me.  And she sent them a letter to see would
7  they reconsider.
8  Q.  She told you she would represent
9  you?
10  A.  Yes.
11  Q.  Was she telling you she was an
12  attorney?
13  A.  No, no.  As far as sending a
14  letter to the insurance company on my
15  behalf.
16  Q.  She said she'd send it -- Did she
17  use the word representative or what specific
18  words did she use?
19  A.  She said she would send a letter
20  to the insurance company on my behalf to see
21  would they reconsider paying the bill.
22  Q.  Which bill?  Was it the bill --
23  Was this the bill to Advanced Surgical

Page 116

1  Associates?
2  A.  Advanced Surgical Associates, to
3  Anesthesiology, Jackson Hospital on behalf
4  of all the medical bills and stuff that I
5  had accumulated.
6  Q.  Okay.  So she said she -- She told
7  you she was writing a letter for all of your
8  medical bills?
9  A.  She was writing a letter for them
10  to see would they reconsider paying the
11  bills and stuff that I owed.
12  Q.  Okay.  Did you -- Your
13  understanding was she was employed by
14  Advanced -- Is it your understanding she was
15  employed by Advanced Surgical Associates at
16  that time?
17  A.  Yes.
18  Q.  Okay.  As I guess an RN?
19  A.  Yes.
20  Q.  Okay.  And Advanced Surgical
21  Associates was one of the medical providers
22  that had money outstanding, a bill
23  outstanding to be paid?

29  (Pages 113 to 116)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1    A.  Yes.
2    Q.  Okay.  Did you give her anything
3  for writing this letter on your behalf?  Did
4  you give her any money or any --
5    A.  No.
6    Q.  No?
7    A.  No.
8    Q.  She just did it?
9    A.  Yes.
10    Q.  Okay.  Had you provided her copies
11  of medical bills other than from Advanced
12  Surgical Associates?
13    A.  No.
14    Q.  Okay.  Do you know whether she had
15  seen your medical bills other than those of
16  Advanced Surgical Associates?
17    A.  Not to my knowledge, no.
18    Q.  Okay.  After she wrote this
19  letter, did you talk to Jennifer Owes again
20  after she wrote this letter?
21    A.  Yes.
22    Q.  Tell me about that conversation.
23    A.  After she told me that she was

Page 118

1  writing the letter, I talked to her.  And
2  she let me know that she did send them the
3  letter and asked them to reconsider.
4    Q.  Okay.
5    A.  After that, I haven't talked to
6  Jennifer anymore.
7    Q.  You had a conversation where she
8  told you she had sent the letter?
9    A.  Yes.  She had sent the letter.  I
10  went by the office, picked the letter up
11  from her, and I haven't talked to her
12  anymore.
13    Q.  How soon after she sent the letter
14  did you have this conversation with her?
15    A.  Maybe about less than a week
16  afterwards.
17    Q.  Okay.  Have you -- Up to this day,
18  have you talked with her again?
19    A.  No.
20    MR. BROOKS:  That's all I have.
21    MR. STRENGTH:  I don't have
22  anything else.
23    MR. BROOKS:  Thank you.

Page 119

1       C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  MONTGOMERY COUNTY)
5
6       I hereby certify that the above
7  and foregoing deposition was taken down by
8  me in stenotype, and the questions and
9  answers thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14       I further certify that I am
15  neither of counsel, nor of kin to the
16  parties to the action, nor am I in any wise
17  interested in the result of said cause.
18
19
20       -----------------
21       CINDY WELDON
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**