# TAB 2

```
 1     IN THE UNITED STATES DISTRICT COURT FOR
 2       THE NORTHERN DISTRICT OF ALABAMA
 3            SOUTHERN DIVISION
 4
 5  CASE NUMBER:  2:05-CV-1002-ID
 6
 7  ALICE J. BROWN,
 8          Plaintiff,
 9          vs.
10
11  ITPE HEALTH AND WELFARE FUND,
12          Defendant.
13
14          S T I P U L A T I O N
15      IT IS STIPULATED AND AGREED by
16  and between the parties through their
17  respective counsel, that the deposition
18  of JENNIFER OWES may be taken before
19  Leslie K. Hartsfield, at the offices of
20  Copeland, Franco, Screws & Gill, 444 S.
21  Perry Street, Montgomery, Alabama,
22  36101.
23          DEPOSITION OF JENNIFER OWES
                                              1
```

```
 1  taken on the 14th day of July, 2006.
 2      IT IS FURTHER STIPULATED AND
 3  AGREED that the signature to and the
 4  reading of the deposition by the witness
 5  is waived, the deposition to have the
 6  same force and effect as if full
 7  compliance had been had with all laws
 8  and rules of Court relating to the
 9  taking of the deposition.
10      IT IS FURTHER STIPULATED AND
11  AGREED that it shall not be necessary
12  for any objections to be made by counsel
13  to any questions except as to the form
14  or leading questions, and that counsel
15  for the parties may make objections and
16  assign grounds at the time of the trial,
17  or at the time said deposition is
18  offered in evidence, or prior thereto.
19      IT IS FURTHER STIPULATED AND
20  AGREED that the notice of filing of the
21  deposition by the Commissioner is
22  waived.
23
                                              2
```

```
 1              INDEX
 2  EXAMINATION BY:        PAGE NUMBER:
 3  Mr. Brooks                 6
 4  Mr. Strength              68
 5
 6
 7
 8  DEFENDANT'S EXHIBITS:
 9  1 - Letter                37
10
11
12
13
14
15
16
17
18
19
20
21
22
23
                                              3
```

```
 1     IN THE UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF ALABAMA
 3            SOUTHERN DIVISION
 4
 5  CASE NUMBER:  2:05-CV-1002-ID
 6
 7  ALICE J. BROWN,
 8          Plaintiff,
 9          vs.
10
11  ITPE HEALTH AND WELFARE FUND,
12          Defendant.
13
14  BEFORE:
15      LESLIE K. HARTSFIELD,
16      Commissioner.
17
18  APPEARANCES:
19      COCHRAN, CHERRY, GIVENS & SMITH,
20  P.C., by Mr. Brian P. Strength, 306
21  North Main Street, Tuskegee, Alabama,
22  36083, appearing on behalf of the
23  Plaintiff.
                                              4
```

1    LANIER, FORD, SHAVER & PAYNE,
2 P.C., by Mr. Taylor P. Brooks, 200 West
3 Side Square, Suite 5000, Huntsville,
4 Alabama, 35801, appearing on behalf of
5 the Defendant.
6
7            ********
8
9    I, LESLIE K. HARTSFIELD, a Court
10 Reporter of Prattville, Alabama, acting
11 as Commissioner, certify that on this
12 date, as provided by the Federal Rules
13 of Civil Procedure and the foregoing
14 stipulation of counsel, there came
15 before me at the offices of Copeland,
16 Franco, Screws & Gill, P.A., 444 S.
17 Perry Street, Montgomery, Alabama,
18 36101, beginning at 2:03 p.m., JENNIFER
19 OWES, witness in the above cause, for
20 oral examination, whereupon, the
21 following proceedings were had:
22
23
                                          5

1 please feel free to tell me you don't
2 understand and I'll rephrase the
3 question.  You know, sometimes lawyers
4 ask questions that don't make any sense.
5 And you know, I've probably been guilty
6 of that a time or two so please feel
7 free to tell me if you don't understand
8 fully any part of my question.  I'll be
9 happy to repeat it, restate it until you
10 understand the question.  If you do
11 answer the question, I'm going to assume
12 that you understood what I ask, is that
13 fair?
14    A.    Uh-huh (affirmative
15 response).
16    Q.    Another thing is we have a
17 court reporter taking down what you say
18 so, you know, this is going -- it's
19 going to end up being a transcript
20 (indicated), and so when I ask you a
21 question, if you could answer yes or no
22 because it's hard for her to take down
23 like if you nod your head or if you say
                                          7

1        JENNIFER OWES
2    being first, duly sworn, was examined
3        and testified as follows:
4
5        MR. BROOKS:  Usual
6 stipulations?
7        MR. STRENGTH:  Sure.
8
9 EXAMINATION BY MR. BROOKS:
10    Q.    Hello, Ms. Owes.  That's
11 how -- did I pronounce your name
12 correctly?
13    A.    Uh-huh (affirmative
14 response).
15    Q.    My name is Taylor Brooks.
16 I'm the attorney for the ITPE Health and
17 Welfare Fund.  And I -- we are here
18 today because of a lawsuit filed by Ms.
19 Alice Brown against the ITPE Health and
20 Welfare Fund and I'm going to ask you
21 some questions about your knowledge
22 about that case.  When I ask you a
23 question, if you don't understand it,
                                          6

1 uh-huh or huh-uh.  When we go back and
2 read the transcript, it's kind of
3 difficult for us.  If you could make
4 sure and answer verbally, that would
5 help us out.  I'd appreciate it.
6    A.    Spell that, uh-huh
7 (affirmative response).
8    Q.    Also, anytime you need to
9 take a break, if you need to take a
10 restroom break or a break for any other
11 reason, please feel free to let me know.
12 I may just ask if there's a question
13 pending, I may ask you to just finish
14 that answer, but otherwise, you know,
15 you can take a break.  We're not having
16 any type of endurance contest going on.
17 And do you understand what I just told
18 you?
19    A.    Yes.
20    Q.    Have you taken any
21 medication or is there any reason you
22 wouldn't be able to testify today?
23    A.    No.
                                          8

1    Q.    What's your current
2 address?
3    A.    619 Butterfly Drive.
4    Q.    That's the same as we have
5 on the subpoena.
6    A.    Montgomery, Alabama,
7 36117.
8    Q.    Ms. Owes, where -- do you
9 have a college degree?
10    A.    Yes.
11    Q.    Where do you have a degree
12 from?
13    A.    Troy State.
14    Q.    Troy State.  What's your
15 degree in?
16    A.    Bachelor's of Science in
17 nursing.
18    Q.    Do you have any graduate
19 degrees?
20    A.    No.
21    Q.    What year did you graduate
22 Troy State?
23    A.    1998.

9

1    Q.    Where did you attend high
2 school?
3    A.    Carver, George Washington
4 Carver here in town.
5    Q.    That's here in Montgomery?
6    A.    Uh-huh (affirmative
7 response).
8    Q.    What year did you
9 graduate?
10    A.    '94.
11    Q.    Where are you currently
12 employed?
13    A.    Jackson Hospital and
14 Clinic.
15    Q.    Did you say Jackson Hospital
16 and Clinic?
17    A.    That's the official title.
18    Q.    Official title, okay.  How
19 long have you worked for Jackson
20 Hospital and Clinic?
21    A.    One year and 11 months.
22    Q.    One year and 11 months.  So
23 you would have started in August of

1 0

1 2005?
2    A.    August of 2004.
3    Q.    Oh, yeah.  Your math is
4 better than mine.  Good.  You can see
5 why I'm a lawyer and not a
6 mathematician.  Started August 2004.
7    A.    Uh-huh (affirmative
8 response).  I also still do a little
9 part-time work with Dr. Williams'
10 office.  Usually about maybe four hours
11 a week.
12    Q.    And have you done part-time
13 work for Dr. Williams during the entire
14 time?
15    A.    I left his office August of
16 2004 full-time -- as a full-time
17 employee.
18    Q.    Has it been the same since
19 you left, it's been about four hours a
20 week?
21    A.    About four hours a week.
22    Q.    Since August of 2004?
23    A.    Yes.  Sometimes a little

1 1

1 more.  Sometimes a little less.  It just
2 depends.
3    Q.    Just kind of as a rough
4 estimate.
5    A.    I still -- yeah, I still
6 assist him in surgery on some days and
7 afternoon time.  Some days I may go over
8 and help in the office, just depends on
9 what he needs done.
10    Q.    What are your duties as an
11 employee of Jackson Hospital and
12 Clinic?
13    A.    I work in surgery.  I am a
14 circulator.
15    Q.    A what?  I'm sorry.
16    A.    It's officially called a
17 circulator.
18    Q.    Circulator.
19    A.    Yes.
20    Q.    What does a circulator do?
21    A.    You mean explain it to you
22 in kind of ER terms?
23    Q.    You can go ahead and explain

1 2

1 it to me.  If I don't understand you,
2 I'll ask you a follow-up question.
3      A.    I interview the patient,
4 make sure, you know, what they're there
5 for and find out any specifics as far as
6 allergies, that sort of thing.  Then I
7 take them to the operating room.  I make
8 sure that the room is ready as far as
9 the equipment being present and
10 accounted for.  I do counts, and you
11 know, that sort of thing.  And I'm the
12 person that would position the patient,
13 prep the patient, get them ready for
14 surgery, as opposed to -- I can also
15 scrub.  The scrub is the person that you
16 see on TV that the doctor says scalpel,
17 hemostat, you know, that passes the
18 instruments.  I can do either role.
19      Q.    You do -- you're the scrub,
20 you say you do that sometimes?
21      A.    Sometimes I scrub.
22 Sometimes I circulate.  A nurse can
23 scrub and circulate but a scrub can't

1 3

1 circulate.  You have to be an RN to
2 circulate.
3      Q.    And those have been your
4 duties ever since you worked for Jackson
5 Hospital and Clinic?
6      A.    Yes.
7      Q.    And before you worked for
8 Jackson Hospital and Clinic, you
9 indicated you worked for -- you were
10 full-time for Dr. Williams?
11      A.    Uh-huh (affirmative
12 response).
13      Q.    What's his full name?
14      A.    Antonio.
15      Q.    Dr. Antonio Williams.
16      A.    Antonio J.
17      Q.    How long did you work for
18 Dr. Antonio Williams?
19      A.    Five years.
20      Q.    So that would be approx
21 sense, approximately 1999?
22      A.    Yes.
23      Q.    Approximately August of '99

1 4

1 to August of 2004; is that correct?
2      A.    Yes.  Almost to the exact
3 date as far as five years.
4      Q.    What were your job duties
5 with Dr. Williams?
6      A.    I started out being the
7 clinical supervisor for the office, just
8 everything to do with the clinical area
9 from patient care, care management, case
10 management, ordering, you know,
11 different tests, that sort of thing to
12 being his assistant.  I think I did just
13 clinical supervisor for about six
14 months, six, nine months.  Then after
15 that I was his assistant, surgical
16 assistant in the office.  I did
17 paperwork.  I operated with him.  Kind
18 of where he went I went.
19      Q.    I guess a surgical assistant
20 assists the doctor in surgery and
21 also --
22      A.    In the office.
23      Q.    In the office.  Do you talk

1 5

1 to patients?
2      A.    Yes.
3      Q.    Help with paperwork?
4      A.    Yes.  As far as the gastric
5 bypasses went, that was all -- I would
6 say that's Jennifer's baby.  He wasn't
7 doing the gastrics to start with.  He
8 started out -- when I first got there --
9 when I'm saying to start with, he didn't
10 start doing them until I think it was
11 2001 -- 2000 or 2001.  But all the
12 paperwork that went along with that as
13 far as the insurance approvals, any
14 tests that needed to be done, scheduling
15 the surgeries, everything that went with
16 the gastric bypass, if he didn't do it,
17 then I did it.
18      Q.    You assisted in gastric
19 bypass surgeries?
20      A.    Uh-huh (affirmative
21 response).
22           THE REPORTER:  Yes?
23      A.    Yes.

1 6

1   Q.   So when did you become a
2 surgical assistant, like around what?
3 Do you know the date you started out as
4 the clinical supervisor?
5   A.   I don't have an exact date.
6 I could possibly get you one if you
7 needed to as far as when I got my first
8 privileges.  In order to assist in
9 surgery as a nurse or in order to be an
10 assistant, you have to have -- be
11 granted privileges through the
12 hospitals.
13   Q.   Do you have an approximate
14 date?  I mean, you don't have to give me
15 an exact date but do you have a best
16 guess of when that occurred?
17   A.   Let's say May of 2000
18 maybe.
19   Q.   I'm not -- we're not holding
20 you to that exact day.
21   A.   I can get you an exact date,
22 but I just don't --
23   Q.   It would have been within

1 7

1 your first two years?
2   A.   Yes.
3   Q.   So it would have been, you
4 know, somewhere at the very latest in
5 2001?
6   A.   Yes.
7   Q.   Gotcha.  You would have --
8 you were a surgical assistant until you
9 left Dr. Williams' office?
10   A.   Yes.
11   Q.   Are you familiar with the
12 plaintiff, Alice Brown, in this case?
13   A.   Yes.
14   Q.   When did you first meet Ms.
15 Brown?
16   A.   On her initial office
17 visit.
18   Q.   You didn't know her
19 previously?
20   A.   No.
21   Q.   Do you have any memory of
22 when that was or --
23   A.   No.  However, there would

1 8

1 have been an initial consultation visit
2 on her chart.
3   Q.   Right.  I have the -- Dr.
4 Williams' medical records.  What -- do
5 you remember why -- the first time she
6 came to visit, why -- what was the
7 purpose of the visit or what was said?
8   A.   Consultation for a gastric
9 bypass.
10   Q.   That was the first time she
11 came is a consultation for a gastric
12 bypass?
13   A.   Yes.
14   Q.   Do you remember what your
15 discussions were with Ms. Brown the
16 first time she came?
17   A.   How we did the consultation
18 was we would see each individual patient
19 and do a history and physical on them in
20 an individual room.  And then after
21 that, they'd sit in our conference room
22 at a table not quite this long, but at a
23 conference table, and he would do a

1 9

1 presentation where he would talk and
2 answer all questions, go over all the
3 specifics of the gastric bypass, any
4 kind of risk, benefits, that sort of
5 thing.  And then I would talk to them
6 afterwards or before regarding what they
7 needed to do from here.  If they were
8 still interested after hearing the
9 presentation on the gastric bypass,
10 where we go from there as far as what
11 tests needed to be done, what I do as
12 far as submitting the insurance
13 information, about how long they should
14 expect before we hear back from them,
15 that sort of thing.
16   Q.   Do you have a recollection
17 of anything Ms. Brown said during the
18 initial visit?
19   A.   No.
20   Q.   No.  You have a recollection
21 of any questions that she had?
22   A.   Not specific, no.
23   Q.   At the initial visit, did

2 0

1 you discuss the issue of payments for
2 her medical bills?
3      A.   I let everybody know on
4 their initial visit that, you know, we
5 will file and try to get a
6 predetermination from your insurance
7 company and we'll go from there.
8      Q.   You don't remember
9 discussing it further with her at the
10 initial visit?
11 ·    A.   No.
12     Q.   Do you remember Ms. Brown
13 returning after her initial visit?
14     A.   After the initial visit,
15 what we would do is they'd get all their
16 appointments taken care of, whatever
17 kind of preoperative assessment that Dr.
18 Williams thought they needed to have
19 done and I would call the insurance
20 companies, see what they wanted.
21 Because some insurance companies
22 requested specific things, some things
23 that I thought were -- I mean, some

                                    2 1

1 companies requested extraordinary stuff,
2 psych evaluations, lab work done,
3 different things like that.  I called to
4 make sure that they didn't want anything
5 aside from what we wanted and then we'd
6 go from there as far as when we could
7 schedule a date.  Usually we didn't see
8 them back until they were coming back
9 for their preoperative visit like
10 getting their surgery schedule once
11 everything was already in place.
12     Q.   How did you -- were you
13 given information about I guess what you
14 call insurance payments or a medical
15 payment how -- at the initial visit,
16 does she fill out a form where she told
17 you --
18     A.   They fill out the, you know,
19 the office -- the initial when you go to
20 a doctor's office, your name -- your
21 demographics, name, address, and all
22 that stuff.  And it has a place on there
23 for insurance.  We requested a copy of

                                    2 2

1 their driver's license and insurance
2 card, that sort of thing so that way I
3 can have a number to call and talk to
4 somebody.  That's when I got a copy of
5 her insurance card.
6      Q.   So you didn't call while she
7 was there?
8      A.   No.
9      Q.   So the calls would be made
10 after their initial visit but before
11 they came in for a second visit?
12     A.   Yes.  The call would be
13 made -- I mean, the call to the
14 insurance company is made before any
15 surgery is scheduled, before any date is
16 discussed.
17     Q.   And if she would have had
18 other tests you would have had to run
19 also after the initial visit?
20     A.   Not that we would have run
21 specifically but that she would have
22 needed to have gotten done with other
23 facilities.

                                    2 3

1      Q.   Okay.  You guys would
2 coordinate that with her?
3      A.   Yes.
4      Q.   The doctor's office would,
5 okay.
6      A.   What we do is just say if he
7 said she needed to have an ultrasound
8 done or if she needed to have some type
9 of cardiac evaluation done, then I call
10 and say, hey, this is Jennifer calling
11 from Dr. Williams' office.  I got a
12 patient that I need y'all to see for
13 whatever test it was.  And they would
14 have done any kind of insurance stuff
15 that they needed to do regarding that
16 test.  All I do is I would get the test
17 scheduled.  Like just say they have an
18 insurance company that requires a
19 referral or that sort of thing that
20 comes from their primary physician, then
21 that's the patient's responsibility to
22 make sure that their referral system is
23 done how they needed to get done for

                                    2 4

1 referrals.

2    Q.    After the initial visit, did
3 you call the ITPE Health and Welfare
4 Fund?

5    A.    Yes.

6    Q.    You personally?

7    A.    Personally called.

8    Q.    You personally called.  Do
9 you remember that call?

10    A.    Yes.

11    Q.    Do you know -- so you talked
12 to somebody at the ITPE Health and
13 Welfare Fund?

14    A.    Yes.

15    Q.    Do you remember the name of
16 the person that you talked to the first
17 time you spoke?

18    A.    I reviewed the chart since I
19 talked to you, but I talked with Cheryl
20 and I talked to Cheryl both times.

21    Q.    You talked to somebody named
22 Cheryl?

23    A.    Uh-huh (affirmative

                                    2 5

1 response).  Yes.

2    Q.    Did you get a last name or
3 just Cheryl?

4    A.    I did not get a last name.

5    Q.    And what did you say to
6 Cheryl and what did she say to you?

7    A.    My usual spill is this is
8 Jennifer calling from Dr. Antonio
9 Williams' office.  I'm calling
10 regarding, patient's name.  Ms. Brown is
11 interested in having a gastric bypass
12 procedure code 43496; that's the CPT
13 code that most insurance companies want
14 to know.  And I was wanting to know what
15 is your process for predetermination.
16 And Cheryl did whatever it was that she
17 did and I said -- as a matter of fact,
18 for an unusual insurance company,
19 sometimes I would say do you cover the
20 procedure first off.  And if they say
21 yes, which Cheryl told me they did, what
22 is your process for predetermination.
23 She said that all I need to do was just

                                    2 6

1 do the surgery and submit the
2 information including the procedure code
3 and they would go from there, that they
4 would pay accordingly.  And I said so
5 y'all don't have to -- 'cause I remember
6 when I looked in the chart I put a note,
7 no extraordinary -- no extraordinary
8 requests, no psych evaluation.  I think
9 it was -- I can't remember.  If you have
10 a copy of the chart, on the initial
11 route sheet I had a date, spoke with
12 Cheryl, and what she said under it.  And
13 she didn't request anything extra.  I
14 said are you going to send me a letter.
15 She said no, we don't send letters.  I
16 said is there any kind of authorization
17 number or any kind of -- anything that
18 I -- she said no, just once you do the
19 surgery, you submit the claim, and we
20 process it from there.  Said okay.

21         I was thinking this doesn't
22 sound right because I've done so many of
23 them that they always give me some kind

                                    2 7

1 of number, some kind of letter that they
2 send or something.  So I said okay,
3 well, that's fine.  I contacted the
4 patient, Ms. Brown.  They said it's a
5 covered procedure.  They pay for it.
6 We're going to go ahead and get you
7 scheduled.  Did that.  Finish with your
8 appointments, that sort of thing.  We
9 got our surgery date.

10         I still didn't feel good
11 about it.  I called back a second time,
12 spoke with Cheryl again to make sure
13 that she was still covered because I
14 have had times when I call back a
15 patient had lost their job or you know
16 something wild where they weren't
17 covered under that policy anymore.  So I
18 wanted to make sure she was still
19 covered and that it was a covered
20 procedure and I didn't need to do
21 anything else.  Cheryl told me again,
22 they didn't require any kind of special
23 information, no special tests, nothing

                                    2 8

1 extraordinary, file the claim.
2    Q.    And this second
3 conversation, would that have occurred
4 shortly before her surgery date?
5    A.    Yes.
6    Q.    Before her surgery date,
7 were those the only two conversations
8 that you've had with Cheryl?
9    A.    Yes.
10    Q.    Did you receive I guess
11 before her surgery from anyone a copy of
12 the ITPE Health and Welfare Fund plan?
13    A.    No.
14    Q.    Did you discuss with Ms.
15 Brown what she understood the plan to
16 be?
17    A.    She told me she thought they
18 paid for it.
19    Q.    She said -- did she refer to
20 the plan or did she just give you an
21 opinion? I'm talking about Ms. Brown,
22 not -- I'm limiting my question to the
23 plaintiff, Alice Brown.

2 9

1    A.    I'm pretty sure that she
2 told me that it was a covered procedure
3 'cause a lot of times when I saw
4 insurance companies that were, not
5 weird, but you know, not Blue Cross/Blue
6 Shield, Aetna, you know, the normal
7 policies, I'd ask do you know if they
8 pay for the procedure.
9    Q.    So when you called and spoke
10 with Cheryl, I guess let's start the
11 first time, you didn't call her with any
12 specific language from the plan or
13 policy, you just flat out asked is it
14 covered; is that correct?
15    A.    Patient's name. Yes.
16 Patient's name, policy number, whatever
17 information they need to pull them up.
18 Wait until they're with me, we're
19 talking about the same patient, and then
20 ask with the procedure code, 43496 is
21 gastric bypass, long lim, short lim, I
22 don't remember the exact wording for the
23 CPT code, but is it a covered

3 0

1 procedure.
2    Q.    You've told me what I guess
3 Cheryl said to you. She say anything
4 else besides -- I mean, you asked her if
5 it was covered?
6    A.    And if it was covered, then
7 what did I need to do for
8 predetermination.
9    Q.    And you told me what she
10 said already. Did she say anything else
11 in that -- in the first conversation,
12 did she say anything else other
13 than what -- do you remember her saying
14 anything else other than what you've
15 already testified to?
16    A.    Not that I recall. As I
17 said, if you've got a copy of the chart,
18 then it should be -- I actually wrote
19 pretty much what she said, a quick blurb
20 there.
21    Q.    By the second time that you
22 called her which would have been shortly
23 before her surgery, had you seen a copy

3 1

1 of the ITPE Health and Welfare Fund plan
2 at that point?
3    A.    No. Ordinarily I don't have
4 a copy of the plan for Blue Cross or
5 anybody else.
6    Q.    Had you discussed the terms
7 of the plan with anybody before the
8 second -- before the second
9 conversation?
10    A.    What do you mean?
11    Q.    A plan has provisions in it
12 that says this --
13    A.    When I talked to Cheryl,
14 that was discussing the terms of the
15 plan.
16    Q.    Other than the conversation
17 you've told me about, did you discuss
18 the terms of the plan with anyone, is a
19 better question?
20    A.    No. You do understand not
21 other than with Cheryl who was the ITPE
22 representative that I talked to.
23    Q.    Correct. That was my

3 2

1 question.  Other than your conversation
2 with Cheryl --
3     A.    No.
4     Q.    -- at the time of your
5 second call, you had not discussed the
6 terms of the plan with anyone nor had
7 you seen the plan yourself?
8     A.    No.
9     Q.    Your second discussion with
10 Cheryl, you've told me you called her
11 and said you wanted to make sure it was
12 covered?
13     A.    (Nodded head affirmatively.)
14 Gave her a surgery date.
15     Q.    And what did she say
16 again?
17     A.    I said are you sure there's
18 nothing else that needs to be done;
19 no.
20     Q.    Did she say anything else?
21     A.    Not that I recall.
22     Q.    Did you ask her anything
23 else?

                                    3 3

1     A.    Anything other than what?
2     Q.    What you've already
3 testified to.  I'm sorry.  That's a fair
4 question.  That's fair.  Other than what
5 you've already testified to, did you ask
6 her any other questions during the
7 second conversation?
8     A.    Not that I recall.
9     Q.    Other than generally talking
10 about whether the plan was covered --
11 whether the surgery was covered, a
12 general question and what needed to be
13 submitted, were there any other
14 discussions about the terms of the
15 plan?
16     A.    Say it again.
17     Q.    Other than what -- you've
18 told me you asked her was it covered?
19     A.    Uh-huh (affirmative
20 response).
21     Q.    And you asked her what you
22 needed to do as far as submitting
23 paperwork?

                                    3 4

1     A.    Uh-huh (affirmative
2 response).
3     Q.    Other than that, were there
4 any other discussions about what the
5 plan said?
6     A.    No.
7     Q.    Did you ask her about -- you
8 already said you didn't know what the
9 plan said.  So you never asked her about
10 any specific provision that you had
11 already read?
12     A.    That's why I asked her did
13 it require anything extraordinary.
14 Because some of them want you to have a
15 specific BMI, specific comorbidities.
16 They're very specific as far as what it
17 is they'll cover.  They'll cover it if
18 you meet these criteria.  They'll cover
19 it if you've got a psych evaluation.  If
20 you've got -- you know, I'm saying those
21 are the extraordinary things that I was
22 asking about.  I asked her no psych
23 eval, no -- she's like no, none of that.

                                    3 5

1     Q.    My question is:  You asked
2 her general questions about what was
3 covered, asked her what --
4     A.    No.  I asked her
5 specifically was gastric bypass
6 covered.
7     Q.    You asked her specifically
8 whether gastric bypass was covered and
9 what you needed to submit.  Did you ask
10 her about any specific provision of the
11 plan that you were aware of; in other
12 words, was there a specific provision of
13 the plan that you were somehow aware of
14 that you asked her about?
15     A.    No.
16     Q.    Other than those two
17 conversations with Cheryl, did you ever
18 speak with Cheryl again?
19     A.    I spoke with Cheryl after
20 the procedure was done.
21     Q.    Approximately how long after
22 the procedure was done did you talk to
23 Cheryl?

                                    3 6

1    A.    That would have been right
2 about the date that I wrote the letter
3 to ITPE.
4
5        (Defendant's Exhibit No. 1 was
6         marked for identification.)
7
8        MR. BROOKS:  Brian, I'm just
9 going to start back at one instead of
10 trying to take up where we were at the
11 last deposition, is that fine?
12        MR. STRENGTH:  Sure.
13        MR. BROOKS:  Sometimes I do
14 it either way.
15    A.    That would have been when I
16 was made aware of the fact that they did
17 not pay.
18        MR. STRENGTH:  I'll take it.
19 Is that my copy?
20        MR. BROOKS:  No, I was going
21 to give you a copy.  I always do that.
22 I didn't know, you know.
23        I'm handing you Defendant's

3 7

1 Exhibit 1.
2    A.    Okay.
3    Q.    The date on there is March
4 22, 2004.  Would that have been around
5 the date that you spoke to Cheryl?
6    A.    Yes.
7    Q.    That would have been after
8 you spoke to Cheryl for a third time?
9    A.    Yes.
10    Q.    Tell me --
11    A.    Oh, it says here.  When I
12 spoke with Cheryl on today, so I would
13 have spoke to Cheryl on March 22nd.
14    Q.    Spoke to her March 22nd.
15 Fair enough.  What did you say to her
16 and what did she say to you?
17    A.    I told her that I'd spoken
18 with her on two other occasions; says
19 here September 8th and January 23rd, and
20 she told me that it was a covered
21 procedure and no predetermination was
22 needed, no extraordinary requirements,
23 you know, that they had and she told me

3 8

1 that the procedure was covered.  And she
2 said, well, we don't cover gastric
3 bypasses.  And I'm like, but Cheryl, I
4 spoke with you on two separate occasions
5 and you told me that y'all did.  And she
6 said, Well, we don't cover.  We never
7 have covered.  I said, well, Cheryl, you
8 told me on this date and on that date
9 that y'all cover gastric bypasses.  And
10 she said, well, if I told you that, then
11 it was a mistake.  And I told her just
12 like I said in the letter that that was
13 a very costly mistake for a patient to
14 have to suffer for her making a mistake
15 like that.  It took me a while to get
16 Cheryl on the phone.  I called and
17 left -- I called and left Cheryl a
18 couple of messages before I actually got
19 her on the phone.
20    Q.    What else did she say to you
21 in that conversation?
22    A.    She was -- she was very, not
23 flustered but she seemed upset that I

3 9

1 was even questioning her about it and
2 that's when she said, well, if I did,
3 then it was a mistake.  And I was like
4 that's unacceptable.  That's an
5 unacceptable mistake to the tune of over
6 $20,000 for a patient.  And I told her,
7 I said, it's not even that big of a deal
8 the cost that she owes Dr. Williams;
9 that's a drop in the bucket.  But what
10 she owed the hospital, $20,000, nobody
11 can -- I mean, no average person can pay
12 $20,000.
13    Q.    What else was said in that
14 conversation?
15    A.    That was pretty much it.  I
16 asked her if I could speak to somebody
17 else and that sort of thing and she -- I
18 never got to speak to anybody else.  But
19 I sent a letter to the company,
20 attention Joan Wolfe; I think that's who
21 she told me I need to make it attention
22 to.  I'm assuming that was her
23 supervisor.

4 0

1    Q.    And is this exhibit a true
2 and accurate copy of the letter that you
3 sent?
4    A.    Yes.
5    Q.    Did you -- how did this --
6 you drafted this letter.  You signed the
7 letter.  Did you send it off or did
8 somebody else send it?
9    A.    I sent it.
10    Q.    You sent it.  You put it in
11 the mail?
12    A.    Uh-huh (affirmative
13 response).
14    Q.    After you sent this letter,
15 did you hear back from ITPE?
16    A.    Did not get a response.  And
17 Ms. Brown -- I talked to Ms. Brown and I
18 told her that I sent a letter because I
19 sent her a copy and you see everybody
20 else at the bottom that I cc'd it to.
21 But she said don't worry about it 'cause
22 I got me a lawyer and I'm going to sue.
23 I never worried about it again.  I never

                                          4 1

1 followed up with it.  She had a copy of
2 it and she told me she'd take care of it
3 from there.
4    Q.    Is you never -- after you
5 sent the letter, the only conversation
6 you had with Ms. Brown was the
7 conversation you just described?
8    A.    Yes.
9    Q.    Now, before you sent this
10 letter, did you tell Ms. Brown you were
11 sending the letter?  Did you discuss
12 with her that you were sending this
13 letter?
14    A.    I don't recall if I talked
15 to her before, but I know I talked to
16 her after I sent it, because like I
17 said, I sent her a copy as well.
18    Q.    I guess let's go back.
19 Let's start with after the surgery you
20 learned -- you were informed that her
21 medical bills weren't paid; is that
22 correct?
23    A.    Yes.

                                          4 2

1    Q.    Who informed you of that?
2    A.    I don't recall if our
3 insurance department told us -- told me
4 first or if she told me first.  But I
5 spoke with Ms. Brown and the girls
6 upstairs got on to me.
7    Q.    And the girls what?
8    A.    Upstairs, our insurance
9 department upstairs at the office.
10    Q.    Yes.
11    A.    Wanted to know why isn't
12 this bill paid.  I was like I did what I
13 was supposed to do, not only did I -- I
14 mean, I had to answer to them because
15 when the bill came back not paid then
16 they wanted to know.  Usually it would
17 be something as simple as the patient's
18 name wasn't spelled right on the
19 submission or something to that effect.
20 I was like I have no clue.  I've got
21 this here where I talked to Cheryl here
22 and here and everything was in order.
23    Q.    So you spoke to Ms. Brown.

                                          4 3

1 How many times did you speak to her
2 before you sent this letter?
3    A.    Once.
4    Q.    Tell me what you said to her
5 and what she said to you.
6    A.    My goodness.
7    Q.    To the best of your
8 recollection.
9    A.    I remember she calling
10 wanting to know, you know, what
11 happened, why weren't they paying her
12 bill.  She said I thought you said it
13 was going to be covered, and I said,
14 well, let me -- got the chart and let me
15 look.  They did say it was going to be
16 covered.  I talked to Cheryl, you know,
17 and she said on two occasions it was
18 going to be covered.  And I said let me
19 check on it, let me find out what's
20 going on and I'll give you a call back.
21 And that would have been when I start
22 trying to get Cheryl on the phone to see
23 what was going on.

                                          4 4

1    Q.    So do you remember anything
2 else about the conversation with Ms.
3 Brown other than what you just told
4 me?
5    A.    No.
6    Q.    You don't remember saying
7 anything else to her or her saying
8 anything else to you?
9    A.    No.  I told her -- she
10 wanted to know what happened, you know,
11 why wasn't it paid.  I said let me find
12 out.  Let me get them on the phone and
13 see what I can find out.  I remember
14 when I got off the phone with Cheryl I
15 was p.o.'d because for her to just say,
16 well, if I did, it was a mistake.  It
17 was like you can't do that to people.  I
18 just thought that was unacceptable and
19 not fair.
20    Q.    So after you got off the
21 phone, you were p.o'd, what was the
22 first thing that you did in regard --
23    A.    (Indicated.)

                                    4 5

1    Q.    Write this letter?
2    A.    (Nodded head affirmatively.)
3          MR. STRENGTH:  You have to
4 say yes for the record.
5    A.    Yes.
6    Q.    Thanks for catching it.
7          MR. STRENGTH:  You're
8 actually doing better than most people
9 do.  Doing real well on that.
10    Q.    You are.  Absolutely.  So
11 you sat down and composed this letter
12 and you sent it the same day you spoke
13 to Cheryl?  I think that's what you
14 indicated.
15    A.    I -- I think -- as far as I
16 can tell, I did, yes, because I said I
17 spoke with Cheryl on today.
18    Q.    So you'd written a letter.
19 Between the time you spoke to Cheryl and
20 the time you wrote the letter, do you
21 recall talking to Ms. Brown?
22    A.    I don't remember if I talked
23 to her before I wrote the letter or

                                    4 6

1 after.  I don't remember.
2    Q.    The next conversation with
3 Ms. Brown that -- after you spoke to
4 Cheryl, tell me what you said to her and
5 she said to you.
6    A.    I told her that Cheryl said
7 that if she had told me that that it was
8 a mistake.  And I told her I was trying
9 to get somebody else on the phone,
10 couldn't, and I was writing this letter,
11 attention Joan Wolfe and I would give
12 her a copy of it, going to send it to
13 them and see what they had to say after
14 that.
15    Q.    You're saying that you don't
16 know if it was already sent or not when
17 you talked to her?
18    A.    I don't remember.
19    Q.    What did Ms. Brown say to
20 you?
21    A.    She just told me okay to
22 that, that was fine.  The next time I
23 talked to her I just wanted to let her

                                    4 7

1 know that I had not heard anything back
2 and had she heard anything back and
3 that's when she told me not to worry
4 about it; that she called Jock.
5    Q.    Is that what she said?
6    A.    (Nodded head affirmatively.)
7          MR. STRENGTH:  Just call
8 Jock.
9    A.    You got to love the
10 commercial.
11    Q.    I don't live around here so
12 I don't see the commercial.  So you
13 spoke to her and you told her you were
14 writing a letter?
15    A.    Either I told her I was
16 writing it or I had wrote it.  I don't
17 remember.
18    Q.    And her response was okay?
19    A.    We'd, you know, we'd see.
20 We both were going to wait and see what
21 came of the letter.
22    Q.    Can you tell me anything
23 else about this conversation other than

                                    4 8

1 what you've already described?

2     A.    No.

3     Q.    And you had one more
4 conversation after that in which she
5 said that she was going to -- she had a
6 lawyer and that was your only
7 conversation with her?

8     A.    That was the last I heard of
9 it.

10    Q.    Last you heard from her.  I
11 guess I got a little out of -- okay.  So
12 how many times did you meet with Alice
13 Brown as a patient?  You met with her in
14 the initial meeting.

15    A.    I met with her --

16    Q.    When was the next -- I'm
17 sorry.  When was the next time you would
18 have seen her?

19    A.    When she came in for her
20 preop visit.  At that time, they have an
21 opportunity to talk with Dr. Williams
22 again if they'd like.  They can ask any
23 more questions.  I go ahead and give

                                4 9

1 them all their preop information as far
2 as when they're going to go to the
3 hospital, who they need to see because
4 we have them to see the dietitian,
5 physical therapist, anesthesiologist,
6 those sort of people as far as getting
7 ready for the surgery.  This is all like
8 immediately preop like within days of
9 their surgery.  And then I would have
10 seen her in the hospital, you know,
11 before the surgery, probably saw her in
12 the hospital a couple days after the
13 surgery as far as making rounds.  Would
14 have seen her back in the office for her
15 postop visit.  I don't remember how
16 many times she came back postop as far
17 as just for, you know, wound check and
18 that sort of deal, immediate postopt
19 appointments.

20    Q.    At any time either over the
21 phone or in person before her surgery,
22 did you discuss her -- the ITPE Health
23 and Welfare Fund or your conversation

                                5 0

1 with them or did she ask you about it?

2     A.    When I called her with her
3 surgery date, you know, I called her and
4 told her that I talked to them.  They
5 said everything was fine that they did
6 cover the procedure.  They didn't need,
7 you know, anything special or anything
8 like that and that was, you know, all it
9 was to say about the insurance; that it
10 was a covered procedure.

11    Q.    That would have been over
12 the phone?

13    A.    Yes.

14    Q.    That would have been after
15 her first visit but before she came in
16 for preop?

17    A.    Yes.

18    Q.    What did she say when you
19 told her that?

20    A.    I don't remember
21 specifically.

22    Q.    So other than your
23 conversation telling her about -- your

                                5 1

1 conversation with Ms. Brown telling her
2 about your conversation with ITPE, that
3 would have been the only conversation
4 you had about medical payments before
5 her surgery?

6     A.    Yeah.  Yes.

7     Q.    And after her surgery --

8     A.    Now, I don't remember,
9 Taylor, if she gave me a date that day
10 for her surgery or if she would have
11 called back with the date.  But that
12 would have been the only conversation
13 that we would have had regarding
14 insurance covering the procedure, that
15 sort of thing.

16    Q.    After the surgery, would
17 your first discussion have been with her
18 about medical payments been the one
19 you've already described I guess being
20 her calling and saying ITPE didn't pay
21 for her procedure?

22    A.    You said would that have
23 been the first conversation?

                                5 2

1    Q.    Yeah.  After her surgery.

2    A.    Regarding insurance or
3 anything like that?

4    Q.    Right.

5    A.    Yes.  Now, I'm sure I talked
6 to her regarding, you know, postop
7 appointment.

8    Q.    Right.

9    A.    That sort of thing, how are
10 you doing.  Yeah.  Okay.

11    Q.    Right.  I just want to make
12 sure I haven't missed anywhere along the
13 line, have we discussed every
14 conversation that you've had with Ms.
15 Brown about ITPE making payments for her
16 surgery?

17    A.    As far as I remember, yes.

18    Q.    Now, have we discussed each
19 and every communication you have had
20 with ITPE?

21    A.    As far as I can recall,
22 yes.

23    Q.    You don't remember any other

5 3

1 phone or written conversations other
2 than what you've already testified to?

3    A.    No.

4    Q.    The letter that's in front
5 of you, Defendant's Exhibit 1, did you
6 discuss this letter with anybody besides
7 Alice Brown?

8    A.    Dr. Williams and Rick Mann
9 and Layton Smith.

10    Q.    Who are Rick Mann and Layton
11 Smith?

12    A.    Rick Mann is the business
13 office over at Jackson.  I don't know if
14 Rick is still there.  And Layton Smith,
15 those would have been people that were
16 trying to get money as well that wanted
17 to know -- usually when somebody didn't
18 get paid, then everybody was calling me.
19 That's why I was so meticulous about
20 this.

21    Q.    I gotcha.  What did you tell
22 I guess each of these people or what was
23 your conversation with each of these

5 4

1 people?

2    A.    That I spoke to ITPE and it
3 was covered and all of a sudden now it's
4 not.  And then I'd been in touch with
5 them and I was going to send this letter
6 to them and I was going to cc a copy of
7 it and they said they would put it in
8 her chart or record over with them, you
9 know, over at Jackson.

10         I'm not sure but -- I'm sure
11 you've got Jackson Hospital's records or
12 whatever too, but usually they called
13 and spoke with somebody as well.
14 Usually the accounts receivable or their
15 director, or you know, those kind of
16 people, I usually would have spoken to
17 someone either Ann or Carmen over at
18 Jackson, kind of -- usually they do a
19 double check or make sure that not only
20 Dr. Williams was going to get paid but
21 the hospital was going to get paid.

22    Q.    So you had a lot of
23 different people calling you wanting you

5 5

1 to get these bills paid?

2    A.    Well, no, just usually
3 everything goes smoothly.  It's not, you
4 know, a question of what happened or
5 whatever.  But when something didn't
6 happen, then they'd want to know, you
7 know, like check back with the doctor's
8 office to see did y'all get paid, you
9 know, did they say they were going to
10 pay, what happened, that sort of thing.
11 I imagine when, you know, usually I
12 speak to like I said Ann or Carmen and
13 those are I guess not secretaries but
14 they do paperwork.  But I actually spoke
15 with Rick Mann on this deal because I
16 mean a whole hospital bill unpaid.

17    Q.    And the purpose of this
18 letter was to get the bills paid?

19    A.    An attempt.  I don't know if
20 Jackson did anything in addition to
21 this, but like I told Ms. Brown and I
22 think -- I don't know if I put it in
23 here.  But I mean, the part that she

5 6

1 owed Dr. Williams was a drop in the
2 bucket compared to the hospital.
3     Q.    There was a relationship I
4 guess between -- there was a
5 relationship between the doctor and the
6 hospital where you guys communicate back
7 and forth about payments?
8     A.    Not on a regular basis.
9 Just like I said, they did their own
10 individual calling.  When they couldn't
11 get something or somebody on the phone
12 or whatever then they want, you know,
13 what'd you get, who had you talk to.
14     Q.    So if something goes wrong,
15 there's communication, is that a better
16 way to put it?
17     A.    Yeah, kind of, sort of.
18     Q.    What was your understanding
19 of Alice Brown's -- her diagnosis from
20 Dr. Williams?
21     A.    Morbid obesity.  You want
22 some numbers?  278.01.  I mean, as far
23 as --

                        5 7

1     Q.    What do those numbers mean?
2           MR. STRENGTH:  Diagnosis
3 code, I guess.
4     A.    Diagnosis code.
5     Q.    Fair enough.  So you assist
6 in gastric bypass surgeries; correct?
7     A.    Uh-huh (affirmative
8 response).
9     Q.    And you attend to pay -- to
10 gastric bypass patients before and after
11 their surgery?
12     A.    Uh-huh (affirmative
13 response).  Yes.
14     Q.    What does gastric bypass
15 surgery, what does it do or explain to
16 me what is it and what is its intended
17 purpose.
18     A.    Well, gastric bypass not
19 only reduces the capacity of your
20 stomach it also sets up a malabsorption
21 situation when you eat.  Your stomach
22 goes from about the capacity -- average
23 person can hold about 2000 ccs, about a

                        5 8

1 two liter bottle worth of food.  Once
2 you have a gastric bypass, it cuts it
3 down immediately to about 30 ccs.  Then
4 after that it goes to about 300, just
5 about that Coke can you got.  So not
6 only are you not able to eat as much,
7 when you do the Roux-en-Y part of the
8 procedure, you create a malabsorption
9 situation.  Most of your food is broken
10 down in the first part of the small
11 intestines, your stomach and the
12 jejunum, first part of your small
13 intestine, you cut that out, not cut it
14 out but you bypass it, gastric bypass.
15 You bypass the stomach and the beginning
16 of the small intestines.  That's where
17 you get the fat and a lot of the
18 nutrients out of your food so you don't
19 absorb all the fat out of the food.  So
20 you lose weight on a twofold situation.
21     Q.    The intended purpose -- the
22 intended effect of gastric bypass is to
23 help the patient lose weight?

                        5 9

1     A.    Yes.  Which in turns helps
2 with other medical conditions:  High
3 blood pressure, diabetes, high
4 cholesterol, getting the weight off
5 helps with bad joints, collage of
6 medical problems that are created when
7 you're overweight, morbidly obese.
8     Q.    Do you know that it was
9 effective for Ms. Brown?
10     A.    I don't remember exactly how
11 much weight she lost, but she did have
12 initial weight loss on the visits that
13 we saw her back.  I mean, anybody that
14 has a gastric bypass done, the average
15 is you'll loose 50 to 80 percent of your
16 excess body weight.  When I say excess
17 body weight, just say if you weigh 300
18 pounds and the Metropolitan Life Scale
19 says that the average person your
20 height, weight, and age is supposed to
21 be 150 pounds, you lose 50 to 80 percent
22 of that excess 150 pounds.
23     Q.    Did you assist in Ms.

                        6 0

1 Brown's surgery?

2    A.    As far as I remember, yes.

3    Q.    Do you remember doing it or

4 are you saying that because --

5    A.    I don't specifically

6 remember doing Ms. Brown's surgery, but

7 I was pretty much there for every

8 gastric bypass.

9    Q.    In other words, you were

10 assisting Dr. Williams in every gastric

11 bypass surgery you did therefore you

12 believe you would have assisted around

13 that time; therefore, you believe you

14 would have assisted in Ms. Williams --

15 Ms. Brown's surgery, is that accurate?

16    A.    It would be on his operative

17 record.  He would dictate on there

18 whether I was there or not.

19    Q.    Right.  That's the basis I

20 guess for your remembering that you did

21 it because you were doing all of them at

22 that time?

23    A.    Yes.  I mean, I hate to say

                                        6 1

1 that I did it and I was out with the flu

2 on that day, but yes, as far as I

3 remember.

4    Q.    Was there any --

5    A.    Trying to tell you from here

6 if I wrote the orders in.

7    Q.    Was there any other

8 procedure done other than gastric bypass

9 when she came in or was it just strictly

10 gastric bypass?  Does he combine that

11 surgery with any other surgery when he

12 does that?

13    A.    Usually not.  It has been

14 times that people have had their

15 gallbladder removed at the same time if

16 they already had gallbladder disease.

17 But I don't remember if he combined

18 anything else.  On the initial

19 consultation, he would have checked or

20 asked about any other kind of upper

21 abdominal pain, that sort of thing.

22    Q.    So you don't recall Ms.

23 Brown having any other surgical

                                        6 2

1 procedure done other than gastric bypass

2 at that time?

3    A.    I do not recall.  But it'd

4 be as simple as looking at the opt

5 note.

6    Q.    Let me -- other than the

7 conversations we've already discussed in

8 this deposition, I guess who have you

9 spoken with about the facts of this

10 case?

11    A.    Dr. Williams and I'm pretty

12 sure I talked to Stacey about it.

13 Stacey works at the office.  She's a

14 medical assistant.

15    Q.    What would you and Dr.

16 Williams have talked about?

17    A.    Just do you remember this

18 patient, do you remember this lady I

19 wrote this letter on.  And he read over

20 it and I said can you believe I'm being

21 subpoenaed.  That's about the extent of

22 it, you know, just the usual.  I mean,

23 can't they read the letter, that sort of

                                        6 3

1 thing.

2    Q.    That was your conversation

3 with both the doctor and with Stacey?

4    A.    Yeah.  When I said I believe

5 I talked to Stacey, but I think she was

6 standing there when I had the chart.

7    Q.    Anybody else?

8    A.    No.  well, my husband.

9    Q.    Your husband.  You haven't

10 talked to Mr. Brian Strength.  Have you

11 talked to the plaintiff?

12    A.    No.

13        MR. BROOKS:  I think I want

14 to take a break and I'll let you know

15 whether I have any other questions.

16

17    (A brief recess was taken.)

18

19    Q.    (By Mr. Brooks)  I want to

20 follow up on some questions.  Other than

21 with Ms. Brown, have you ever had any

22 dealings with ITPE Health and Welfare

23 Fund with any other patient to your

                                        6 4

1 recollection?

2    A.    No.

3    Q.    I think that I asked you
4 about whether you had discussed the plan
5 or any plan language with Ms. Brown and
6 ITPE and I think you've already answered
7 those questions.  I guess my question is
8 have you ever discussed it with anyone
9 else besides ITPE or Ms. Brown?

10    A.    No.

11    ·Q.    Last thing we'll do is
12 hand -- what I'm handing you was
13 Defendant's Exhibit 4 to the plaintiff's
14 deposition, that's what I'm handing you.
15 I'm not making it an exhibit for this
16 deposition.  For the record, it's
17 Defendant's Exhibit 4 to Ms. Brown's
18 deposition.  I have tabbed a page which
19 should say -- have a Bates No. 24 on the
20 bottom.

21    A.    Okay.

22    Q.    What is that document?

23    A.    That's our opt note.

65

1    Q.    That's an opt note?

2    A.    Uh-huh (affirmative
3 response).

4    Q.    What is an opt note?

5    A.    The operative summary.  Dr.
6 Williams would dictate this to say any
7 specifics as far as the surgery would
8 go.  It tells, you know, patient, date
9 of birth, preop diagnosis, postopt
10 diagnosis, the procedure, estimated
11 blood loss, fluid intake, urine output,
12 what kind of anesthesia we used and
13 describe the surgery.

14    Q.    It indicates that you
15 participated in the surgery?

16    A.    Uh-huh (affirmative
17 response).

18    Q.    And is a description in
19 there I guess a true and accurate
20 description of her surgery?

21    A.    Do you want me to read the
22 whole thing?

23    Q.    Sure.

66

1    A.    (Reviewed document.)  It
2 should be 40 centimeters from the
3 ligament of --

4        THE REPORTER:  40 what?

5    A.    Centimeters, cm.

6    Q.    Correction on the postopt
7 note?

8    A.    I mean, you want me to see
9 say it's true and accurate.  And I --

10    Q.    That's exactly what I'm
11 asking for.  I was just asking were you
12 correcting something.  I don't have it
13 in front of me.  I gave my copy to you
14 so --

15    A.    It says we counted 40
16 milligrams from the ligament of Treitz
17 and it would be 40 centimeters, but --

18    Q.    I didn't know whether you
19 were expounding on something or
20 correcting it --

21    A.    No, correct it.

22    Q.    -- since I wasn't looking at
23 it.

67

1    A.    Is that what you -- you want
2 me to just --

3    Q.    Sure.  You were doing
4 exactly what I asked you to do.  I just
5 was making sure I understood what you
6 were doing.

7    A.    Other than some minor
8 misspellings or that sort of thing, yes,
9 this is correct.

10    Q.    Is that a true and accurate
11 copy of the postop for Ms. Brown's
12 surgery?

13    A.    It appears to be.

14    Q.    Those are true and accurate
15 diagnosis at the top, that was -- that
16 reflects the diagnosis that was made --

17    A.    Yes.

18    Q.    -- best of your memory?
19 That's all the questions that I have.

20        MR. STRENGTH:  I have very
21 few questions.

22

23 EXAMINATION BY MR. STRENGTH:

68

1   Q.    My name is Brian Strength.
2 We met just a moment ago and I represent
3 Ms. Brown in this case.  Forgive me if I
4 jump around, but since I'm going second,
5 I'm just trying to get through.
6         How common was it for you to
7 call an insurance company when someone
8 comes in to consult about a potential
9 gastric bypass?
10    A.    I was the only person that
11 did it.
12    Q.    In most instances, did you
13 have to call the insurance company?
14    A.    Yes.  Every time.
15    Q.    Do you ever recall a
16 situation where someone told you that a
17 procedure was covered as you've
18 testified happened in this case and then
19 they ended up not paying for the
20 procedure?
21        MR. BROOKS:  Object to
22 form.
23    A.    On one other occasion, and

                                    6 9

1 the only reason was the person had
2 gotten fired from their job.
3    Q.    They weren't covered?
4    A.    They weren't covered.  But
5 they did get an approval but did not
6 have coverage at the time of surgery.
7    Q.    Ms. Brown has testified and
8 I think will testify that she was very
9 pleased that you wrote this letter on
10 her behalf.
11    A.    (Nodded head affirmatively.)
12    Q.    And that you did, in fact,
13 write the letter on her behalf, would
14 you agree with that?
15    A.    Yes.
16        MR. BROOKS:  Object to form.
17 I'm sorry.  What was your answer?
18    A.    Yes.
19    Q.    And that you had her consent
20 to write it and permission, would you
21 agree with that?
22        MR. BROOKS:  Object to form.
23    A.    Yes.

                                    7 0

1    Q.    She also testified that you
2 had --
3    A.    Can I back up?
4    Q.    Sure.
5    A.    When you said she had -- I
6 had her consent and permission, I don't
7 remember if I talked to her before I
8 wrote the letter or after I wrote the
9 letter but she was aware and approved
10 that I sent the letter.
11    Q.    Correct.  If I told you that
12 she had testified that you mentioned to
13 her that you were going to write the
14 letter and she was in full agreement
15 with that, would you have any reason to
16 dispute that?
17        MR. BROOKS:  Object to
18 form.
19    A.    No.
20        MR. BROOKS:  I'm sorry.
21 What was your answer?
22    A.    No.
23    Q.    Can you think of anything

                                    7 1

1 different that Ms. Brown could have done
2 in this instance to avoid the problem
3 that's come up with this bill getting
4 paid?
5        MR. BROOKS:  Object to
6 form.
7    A.    Ask me again.
8    Q.    Sure.  Let me ask it this
9 way:  Do you think it was reasonable
10 under the circumstances for Ms. Brown to
11 go ahead with the surgery believing that
12 it was going to be paid based on what
13 she knew at that time?
14        MR. BROOKS:  Object to
15 form.
16    A.    Yes.
17    Q.    Did you have any reason to
18 believe after speaking twice with Cheryl
19 that the bills would not be paid after
20 the fact?
21        MR. BROOKS:  Object to
22 form.
23    A.    No.

                                    7 2

1    Q.    You testified that on many
2 occasions you would call an insurance
3 company to see if a procedure would be
4 paid?
5    A.    Yes.
6    Q.    Do you ever recall having to
7 see a plan or a copy of an insurance
8 policy before doing that?
9    A.    No, have not ever.
10    Q.    Nobody's ever brought you a
11 copy of a policy or plan?
12    A.    No.
13    Q.    In fact, most people don't
14 walk around with a copy of their
15 insurance policy, do they?
16    MR. BROOKS:  Object to
17 form.
18    A.    No.
19    Q.    But I guess it's been your
20 experience that most people have a copy
21 of their insurance card?
22    A.    Yes.
23    Q.    You detailed a conversation

          7 3

1 a few minutes ago that you had with
2 Cheryl on March the 22nd when you said
3 she sort of, and I'm sort of
4 paraphrasing, she sort of huffed and
5 said, well, if I said that, it was a
6 mistake, do you recall your testimony?
7    MR. BROOKS:  Object to
8 form.
9    A.    Yes.
10    Q.    Did Cheryl ever dispute that
11 she had told you that this procedure
12 would be paid?
13    A.    No.  Cheryl -- Cheryl never
14 said I did not say that.
15    Q.    That's what I'm asking.
16    A.    She said if I did, then it
17 was a mistake, and that was an exact
18 quote from Cheryl.
19    Q.    She never denied telling you
20 that it would be paid; is that
21 correct?
22    A.    No.
23    Q.    Well, I asked the question

          7 4

1 backwards.  Is it your testimony that
2 she never disputed that she told you
3 this?
4    MR. BROOKS:  Object to form.
5    A.    Yes.
6    Q.    When you called and spoke
7 with Cheryl, the number that you called,
8 was that the number from the insurance
9 card?
10    A.    Yes.
11    Q.    Were you under the
12 impression --
13    A.    Did you guys get a copy of
14 the whole chart --
15    Q.    I'm not sure.
16    A.    -- including a copy of the
17 insurance card?  I was going to say I
18 remember I wrote like the extension.
19 When you dial the number, I had to put
20 in the extension and I wrote that on
21 the -- on my copy.
22    Q.    But there was no doubt in
23 your mind that when you were speaking

          7 5

1 with Cheryl you were speaking with
2 someone at ITPE; is that right?
3    MR. BROOKS:  Object to
4 form.
5    A.    Yes.
6    Q.    Did Cheryl ever indicate to
7 you that you needed to speak with
8 someone else about getting preapproval
9 for this procedure?
10    A.    No.
11    Q.    When you spoke with Ms.
12 Brown after it became apparent that
13 there was going to be some problem with
14 getting these bills paid, was she upset?
15    MR. BROOKS:  Object to
16 form.
17    A.    She wasn't like cursing,
18 screaming upset.  She was like, you
19 know, what happened.
20    Q.    Could you tell that she was
21 distressed?
22    MR. BROOKS:  Object to
23 form.

          7 6

1    A.   Yes.

2    Q.   Was that understandable to

3 you under the circumstances?

4         MR. BROOKS:   Object to

5 form.

6    A.   Yes.  She -- it came across

7 that she was upset with me because I

8 hadn't done what I was supposed to have

9 done, and I told her, you know, no,

10 ma'am.  I did what I was supposed to do.

11 Let me get them on the phone and see

12 what happened.

13   Q.   You have not -- I know

14 you've already answered this question in

15 part, but you have not spoken -- we have

16 not spoken before today, have we?

17   A.   No.

18   Q.   No one from my office or

19 anyone acting on behalf of Ms. Brown has

20 spoken with you before today; is that

21 right?

22   A.   No.

23   Q.   No one has promised you

77

1 anything for your testimony?

2    A.   No.  Somebody could pay me

3 for my hour of work.

4    Q.   You need to talk with the

5 man that subpoenaed you, but I agree

6 with you.  Can I ask you -- I'm not sure

7 we got that -- this, Jennifer.  Can I

8 ask you what your current phone number

9 is?

10   A.   (334) 396-2917.

11   Q.   What about your current

12 address?

13   A.   619 Butterfly Drive.

14   Q.   Where is that at, what

15 city?

16   A.   Montgomery, 36117.

17   Q.   Who lives with you at that

18 address?

19   A.   My husband and my

20 three-year-old daughter and my dog

21 Spanky.

22   Q.   Do you have any plans to

23 move from that address in the next two

78

1 or three months?

2    A.   No.

3    Q.   The reason I ask is because

4 I think we can both agree that we hope

5 we don't have to have you come testify

6 again if the case goes to trial, but

7 there's always that possibility.  If we

8 need to get in touch with you, is this

9 number and this address the best way to

10 do that?

11   A:   That or I can give you my

12 cell phone.

13   Q.   That would be good, if you

14 don't mind.

15   A.   That's fine.  391-2812.

16   Q.   Is there an emergency person

17 we can contact if we just get in a real

18 bind and can't get up with you like a

19 friend or relative, like a parent or

20 your boss?

21   A.   Call my mom.  Her name is

22 Deloris, D-E-L-O-R-I-S, Evans and her

23 number is 281-2250.

79

1    Q.   She live in Montgomery?

2    A.   Uh-huh (affirmative

3 response).

4    Q.   I can't imagine any

5 possibility that we would ever need to

6 do that --

7    A.   That's fine.

8    Q.   -- but air on the side of

9 caution.  Have you spoken with -- are

10 you aware that some of these providers

11 have sued Ms. Brown to try to collect

12 this money?

13   A.   No.  I figure it'd just be

14 like the office.  I think they send them

15 to the credit bureau.

16   Q.   Has anyone contacted you in

17 connection with the lawsuits pending

18 against Ms. Brown --

19   A.   No.

20   Q.   -- on these collections?

21   A.   Somebody else is going to

22 call me?  No.

23   Q.   I don't think they will.  I

80

1 didn't know if you had any involvement
2 with these other --
3    A.    No.
4         MR. STRENGTH:  I think
5 that's all I have.
6         MR. BROOKS:  Don't have any
7 more questions.
8
9
10
11
12
13
14
15         FURTHER DEPONENT SAITH NOT
16
17
18
19
20
21
22
23
                                           8 1

1         CERTIFICATE
2
3 STATE OF ALABAMA)
4 AUTAUGA COUNTY)
5
6       I hereby certify that the above
7 and foregoing deposition was taken down
8 by me in stenotype and the questions and
9 answers thereto were transcribed by
10 means of computer-aided transcription,
11 and that the foregoing represents a true
12 and correct transcript of the testimony
13 given by said witness upon said hearing.
14       I further certify that I am
15 neither of counsel, nor of kin to the
16 parties to the action, nor am I in
17 anywise interested in the result of said
18 cause.
19
20
21 _____
22   LESLIE K. HARTSFIELD,
23   COURT REPORTER
                                           8 2

$20,000 40:6, 40:6, 40:10, 40:10, 40:12, 40:12
'94 10:10
'99 14:23
'cause 27:5, 30:3, 41:21
05-CV-1002-I D 1:5, 4:5
1 3:9, 37:5, 54:5
1. 38:1
11 10:21, 10:22
14th 2:1
150 60:21, 60:22
1998 9:23
1999 14:21
2 1:5, 4:5
200 5:2
2000 16:11, 17:17, 58:23
2001 16:11, 18:5
2001. 16:11
2004 11:2, 11:16, 11:22, 15:1
2005 11:1
22nd 38:13, 38:14, 74:2
23rd 38:19
24 65:19
278.01. 57:22, 57:22
281-2250 79:23
2:03 5:18, 5:18
30 59:3
300 59:4, 60:17
306 4:20
334 78:10
35801 5:4
36083 4:22
36101 5:18
36101. 1:22
36117 9:7, 78:16
37 3:9
391-2812 79:15
396-2917 78:10
4 65:13, 65:17
40 67:2, 67:4, 67:15, 67:17
43496 28:12, 30:20
444 1:20, 5:16
50 60:15, 60:21
5000 5:3
6 3:3
619 9:3, 78:13
68 3:4
                                           8 3

80 60:15, 60:21
8th 38:19

< A >
abdominal 62:21
able 8:22, 59:6
above 5:19, 82:6
Absolutely 46:10
absorb 59:19
accordingly 27:4
accounted 13:10
accounts 55:14
accurate 41:2, 61:15, 66:19, 67:9, 68:10, 68:14
across 77:6
acting 5:10, 77:19
action 82:16
actually 31:18, 39:18, 46:8, 56:14
addition 56:20
address 9:2, 22:21, 78:12, 78:18, 78:23, 79:9
Aetna 30:6
affirmative 6:13, 7:14, 8:7, 10:6, 11:7, 14:11,
   16:20, 25:23, 34:19, 35:1, 41:12, 58:7, 58:12,
   66:2, 66:16, 80:2
affirmatively. 33:13, 46:2, 48:6, 70:11
afternoon 12:7
afterwards 20:6
age 60:20
ago 69:2, 74:1
agree 70:14, 70:21, 78:5, 79:4
AGREED 1:15, 2:3, 2:11, 2:20
agreement 71:14
ahead 12:23, 28:6, 49:23, 72:11
air 80:8
ALABAMA 1:2, 1:21, 4:2, 4:21, 5:4, 5:10, 5:17,
   9:6, 82:3
Alice 1:7, 4:7, 6:19, 18:12, 29:23, 49:12, 54:7,
   57:19
allergies 13:6
Almost 15:2
already 22:11, 31:10, 31:15, 34:2, 34:5, 35:8,
   35:11, 47:16, 49:1, 52:19, 54:2, 62:16, 63:7,
   65:6, 77:14
anesthesia 66:12
anesthesiologist 50:5
Ann 55:17, 58:12
                                           8 4

# EXHIBIT 1



**Advanced Surgical Associates** P.C.

*Proven surgical results from doctors who care*

March 22, 2004

ITPE
Attn: Joan Wolfe
P.O. Box 13817
Savannah, GA 31416

Antonio J. Williams, M.D.
2101 Chestnut St.
Montgomery, AL 36106
334-265-9225

RE:     Alice Brown
        12/31/63     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

  This letter is on behalf of Alice Brown. She is a patient that had a gastric bypass on January 30, 2004. I called the customer service line on September 8, 2003. I spoke with Cheryl regarding Ms. Brown having a gastric bypass procedure done. The questions that I had for Cheryl were first if it was a covered procedure and then where would I send information for predetermination. She told me that it was a coved procedure and there was no predetermination needed. I asked her would there be any extraordinary requirements asked for after the procedure such as psychological evaluations, nutritional consult, etc. She told me that all we would need to do is send a claim with diagnosis and procedure codes. I even went so far as to call back on January 23, 2004 to give a date of service for the gastric bypass and make sure there were no changes in coverage. I was told the same thing. That nothing was needed.

  When I spoke with Cheryl on today she told me that if she said that... it was a "mistake". My patient now owes the hospital in excess of twenty thousand dollars. Not to mention the anesthesiologist, and Dr. Williams. That was a very expensive mistake for Cheryl to have made at the expense of a patient. Please be so kind as to reconsider your decision. I look forward to hearing from you regarding this matter.


Jennifer P. Owes, RN

Cc: Alice Brown
  Jackson Hospital and Clinic
  Rick Mann, Director of Business Office
  Layton Smith, Patient Account Director
  Advanced Surgical Associates, Accounting Office
  *2101 Chestnut Street Montgomery, AL 36106 (334)265-9225*